[Civ. No. 67698. Second Dist., Div. Five. Mar. 29, 1984.]

BARBARA KARLIN, Plaintiff and Appellant, v.
EDWARD ZALTA et al., Defendants and Respondents.

954

**COUNSEL**

Milberg, Johnson, De Phillips & Lamson, Gregg A. Johnson, Russell M. De Phillips, John D. Pickett and Godfrey L. Duke, Jr., for Plaintiff and Appellant.

Buchalter, Nemer, Fields, Chrystie & Younger, Robert A. Zeavin, John N. Quisenberry, Cotkin, Collins, Kolts & Franscell, Raymond G. Kolts, Horvitz & Greines, Greines, Martin, Stein & Richland, Irving H. Greines, Horvitz & Levy, Barry R. Levy, Barger & Wolen, Kent Keller, Paul E. Glad, Thomas L. Forsyth and Larry M. Golub for Defendants and Respondents.

## OPINION

## AUERBACH, J.*—

### I. INTRODUCTION

This is an appeal from a judgment of dismissal entered after a demurrer to the complaint of Barbara Karlin (Karlin) was sustained without leave to amend. Karlin instituted this action for herself personally and on behalf of a class of persons similarly situated. The defendants in whose favor judgment was rendered are Dr. Edward Zalta (Dr. Zalta), Southern California Physicians Council, Inc. (SOCAP),[1] a California corporation, the Phoenix Insurance Company (hereinafter Phoenix), a Connecticut corporation, the Travelers Corporation, a Connecticut corporation, the Travelers Indemnity Company, a Connecticut corporation, the Travelers Indemnity Company of America, a Georgia corporation, and the Travelers Indemnity Company of Rhode Island, a Rhode Island corporation (sometimes collectively referred to as the Travelers Group or insurance defendants).

### II. STATEMENT OF THE CASE

#### A. *The Allegations of the Complaint*

The substance of the nine-count pleading revolves around the right to ownership of a fund worth approximately $22 million. This amount (and more is allegedly due) is claimed to have been wrongfully obtained from plaintiff and her class, which consists of all persons in the State of California who purchased medical services from physicians who were members of SOCAP between January 1, 1974, and January 1, 1979. During that time, the class members paid for medical services, a portion of which included an assessment for the cost of malpractice medical insurance premiums paid by SOCAP to Phoenix. It is alleged that during the period in question SOCAP, Zalta, Phoenix, and the insurance defendants were engaged in a conspiracy to monopolize the market and restrain trade by unlawfully fixing the price of insurance and splitting excessive insurance premiums among themselves. The fund was generated when Phoenix and the Travelers Group returned to SOCAP a portion of the excess premiums charged.

From the complaint, we glean that, prior to 1974, SOCAP had a contract under which Hartford Insurance Company provided SOCAP's physician

---

*Assigned by the Chairperson of the Judicial Council.

[1]SOCAP is alleged to be a corporation whose members include physicians and medical societies in seven Southern California counties.

members medical malpractice insurance. Hartford announced that for the year 1974, it planned to increase premiums for medical malpractice insurance by 100 percent. The contract between Hartford and SOCAP was cancelled, and the insurance defendants (specifically Phoenix) and SOCAP entered into a contract effective January 1, 1974, under which Phoenix began writing medical malpractice insurance for the physician members of SOCAP.[2] The contract provided that the insurance defendants were to charge premiums during 1974 which were 30 percent higher than those charged by Hartford during 1973. The contract permitted the premiums for 1975 to increase by up to 15 percent relative to the 1974 rates.

The complaint alleges that Phoenix and the Travelers Group agreed and conspired among themselves and with SOCAP and Dr. Zalta to fix medical malpractice rates in the seven Southern California counties. SOCAP "recognized" that the insurance defendants could earn high investment returns on premiums during the period between the date premiums were paid and the date claims on the malpractice policies were paid. As part of the combination and conspiracy in restraint of trade SOCAP, Phoenix, Dr. Zalta and the Travelers Group included in the insurance contract a provision for the establishment of a fund in which was to be placed the anticipated excess profits generated from the fixed premium rates. To the extent the program was profitable, SOCAP and the insurance defendants would share such profits between themselves according to a prescribed refund formula. The monies obtained by way of excess premiums, as judged by profitability experience and the formula, would be provided to SOCAP out of the fund. By virtue of the experience as of December 31, 1980, resulting profits created a fund of which SOCAP's share alone under the agreement with the insurance defendants amounted to at least $22 million.

The complaint alleged that SOCAP passed on the cost of the premiums to the patients of the physician members of SOCAP and these patients, including plaintiff and the class members, became indirect purchasers of malpractice insurance. Karlin further alleged that she and the class suffered damages, as a result of the price fixing, inasmuch as the inflated cost of medical malpractice premiums paid by SOCAP was charged to them. Plaintiff asserts the fund which accrued from these excessive rates rightfully belongs to her and the class.

The complaint alleges a curious lack of rapport between SOCAP and the insurance defendants. It states that the insurance defendants engaged in the following conduct: Starting early in 1975, the insurance defendants pres-

---

[2]Other forms of insurance coverage were included, but the focus here will be on the medical malpractice insurance.

sured SOCAP to permit premium increases more than 100 percent above that permitted by the contract; throughout 1975 they continuously pressured SOCAP to agree to increased payments from its member physicians; they initiated litigation against SOCAP in order to increase premiums; during 1975 they pursued a campaign to increase premiums "by wrongful ends" including a "propaganda blitz" directed at the consuming public, the Governor, the Legislature, state regulatory authorities, SOCAP, and the individual physician insureds, thus creating what has become commonly known as the "medical malpractice crisis." It is also alleged that the insurance defendants abandoned efforts, however, "to compel premature, improper premium increases for 1975 . . . only after the California Department of Insurance convened an inquiry into whether the insurance defendants were acting wrongfully and were creating a hazard to the public by their actions."

The complaint further alleges that the insurance defendants "gave notice" of a 486 percent increase in the premium rates for medical malpractice insurance since the insurance contract placed no specific ceiling on premium increases for 1976. However, "[t]he Department of Insurance again intervened and advised that any increase in excess of 327 percent would be excessive." The insurance defendants thereupon imposed a 327 percent premium increase which was unnecessary, inappropriate and excessive and resulted in insurance defendants receiving premiums greater than needed to pay claims and receive adequate profits. It was alleged that the increased premium charges imposed by the insurance defendants were passed on to plaintiff and the class through increased charges for medical services. The insurance defendants imposed a 9 percent premium increase in 1977, it being alleged that no premium increase was then required but instead, a premium reduction was called for.

The complaint further alleges that in 1977, SOCAP learned for the first time that a separate charge had been included in premiums to fund the "fund" and it "received intimations" that the insurance defendants "might" try to retain the entire fund without sharing it with SOCAP as agreed. Thereupon SOCAP informed the insurance defendants that such separate charge for the "fund" was improper and that it would not agree to it. Nevertheless, the insurance defendants continued to assess the charge and retain the monies therefrom. This was passed on to plaintiff and her class members in the form of increased charges for medical services. The insurance defendants refused to renew the SOCAP insurance contract beyond January 1, 1979, even though it was profitable to the insurance defendants, so that it might keep the fund for itself without sharing with SOCAP. When SOCAP was unsuccessful in obtaining its demands from the insurance defendants through negotiations, it filed suit on December 31, 1980, to enforce the contract provisions requiring payment of the fund to

SOCAP. In early 1981, SOCAP's suit against the insurance defendants was settled for an amount up to $50 million of which $18.6 million was paid to SOCAP in about February 1981.

It is alleged that "defendants" have not paid and that SOCAP will not pay to plaintiff, or her purported class, any monies from the fund, although SOCAP (through its alleged agent, Dr. Zalta) has declared that plaintiff and her purported class are entitled to the fund and would receive it in the only way practical, i.e., by physicians holding the line on fees.

From 1973 to the present, it is alleged that the insurance defendants, SOCAP and Dr. Zalta combined and conspired in unreasonable restraint of the business of insurance in violation of Insurance Code[3] sections 790.02 and 790.03, subdivision (c) to fix, stabilize, and maintain the price of malpractice insurance at the rates set by Phoenix. As a result of this conspiracy, (1) the price of medical malpractice insurance coverage was fixed, stabilized and maintained at non-competitive levels; (2) consumers paid artificially inflated prices for medical services because the inflated cost of medical malpractice insurance was passed to consumers; and (3) plaintiff and her alleged class have suffered injuries of more than $15,000. Karlin alleged that at all times relevant, the insurance defendants were "the only carrier[s] underwriting malpractice coverage for physicians in southern California"; therefore, a reasonable degree of competition did not exist in Southern California.

The complaint was framed in nine causes of action. The allegations of the first cause of action, which have been recited, sought damages, as indicated, for combination and conspiracy in restraint of the business of insurance, in violation of sections 790.02 and 790.03, subdivision (c). Each succeeding cause of action incorporated by reference every part of the preceding cause or causes of action. The second cause of action was for conspiracy to monopolize in violation of sections 790.02 and 790.03, subdivision (c). It added to the allegations already recited that, beginning as early as 1973, and continuing to the present, defendants formed and engaged in a "combination and conspiracy" to establish a monopoly for Phoenix in the business of medical malpractice insurance in the Southern California area. The insurance defendants combined and conspired to offer SOCAP's members cheaper medical malpractice insurance than Hartford for the sole purpose of establishing a monopoly for Phoenix in the Southern California market and thereafter charging "excessive and exorbitant" premiums for medical malpractice insurance. At some time, SOCAP and Dr. Zalta became aware of the insurance defendants' plan and conspired and "acquiesced" therein

---

[3]All references hereinafter will be to the Insurance Code unless otherwise indicated.

and engaged in the conduct described in furtherance of the plan and conspiracy in order to share in the profits at the expense of the plaintiff and the class. Defendants conspired to establish a monopoly for Phoenix by offering the "fund provision" to SOCAP in order to preclude free and unrestricted competition in the Southern California market and by "increasing premiums in an excessive manner, refusing to reduce rates and wrongfully retaining excess premiums collected from plaintiff and the class" to plaintiff's damage.

The third and fourth causes of action alleged creation of a monopoly and attempt to monopolize, respectively, adding the allegations that the insurance defendants attempted to gain, and actually gained, monopoly power in the medical malpractice insurance market in Southern California and had the ability to fix or control prices and to exclude competition, all in violation of sections 790.02 and 790.03, subdivision (c). It was also alleged that the insurance defendants intended to exercise monopoly power and did so with the "assistance, acquiescence, and cooperation of SOCAP and Zalta."

The fifth cause of action was predicated on the provisions of section 790.03, subdivisions (a) and (b) prohibiting false representations to be made in the sale of insurance and false representations with respect to the business of insurance or with respect to any person in the conduct of his insurance business.

The sixth cause of action sought damages for a conspiracy to charge excessive rates in violation of Insurance Code section 1852 (McBride-Grunsky Act), providing that insurance rates shall not be excessive or unfairly discriminatory. It alleged that, as a result of their wrongful conduct, the insurance defendants accumulated excess monies which they shared with SOCAP, and which rightfully belong to plaintiff and class members. The seventh cause of action sounds in declaratory relief. It alleges that the amount of excess profits earned takes years to determine because of the "long tail," and that Karlin and the class sought an adjudication that they were entitled to current payments of the excess profits from the controverted fund and payments on a periodic basis in the future. Alleging an actual controversy over plaintiff's right to those monies, plaintiff requested a judicial determination of her right to the excess monies now and on a periodic basis into the future depending on the experience in connection with the malpractice program.

The eighth cause of action asked that a constructive trust be established on the fund of excessive charges wrongfully obtained by SOCAP and the Travelers Group pursuant to Civil Code section 2224 and principles of com-

mon law. The ninth cause of action sought relief in equity to prevent SO-CAP and Travelers from being unjustly enriched at the expense of the class.

## B. *The Trial Court Proceedings*

Each of the defendants filed general and special demurrers to plaintiff's initial complaint. The demurrers raised four principal contentions: (1) The McBride-Grunsky Act provided an exemption from antitrust prosecution under all other statutes including sections 790.02 and 790.03, subdivision (c); (2) plaintiff lacked standing to sue as to each of the causes of action; (3) plaintiff failed to exhaust her administrative remedies, thereby warranting a dismissal; and (4) no valid antitrust violations were alleged.[4]

At the hearing on the demurrers, the court inquired at length of Karlin's counsel regarding a possible amendment of the complaint. In response, counsel enumerated four specific additional allegations that could be made against defendants.[5]

The court took the matter under submission and subsequently made the following ruling: "The demurrer of each demurring party is sustained to each cause of action of the complaint pursuant to Section 430.10(a) of the Code of Civil Procedure on the grounds set forth in the points and authorities in support of each demurrer. The special demurrers and the motions to strike are ordered off calendar. Since no means was suggested[6] in the responding papers or oral arguments as to any means by which the defects could be cured by amendment, and since no such means occurs to the court, the demurrers are sustained without leave to amend and the action is dismissed pursuant to Section 581.3 of the Code of Civil Procedure. Order of dismissal was signed and filed this date."

---

[4]Phoenix also contended that plaintiff could not allege a valid claim for declaratory relief and asserted that a request for equitable remedies (eighth and ninth causes of action) does not constitute a cause of action. In addition, all of the defendants demurred on the grounds that no cause of action whatsoever was shown by the allegations in the complaint.

The Travelers Group of insurance defendants other than Phoenix also demurred generally on the grounds that mere allegations of common ownership are insufficient to state a cause of action for conspiracy.

[5]In the colloquy, counsel stated that he could allege: "(1) That SOCAP has admitted that its co-conspirators, 'Travelers, had ripped off our patients (the class) to the tune of approximately $80 million'; (2) that the refund to SOCAP was only a 'partial return of the windfall profits made by Travelers (which) came from the excessive premiums which physicians paid and which it (SOCAP) received from fees paid by our patients (the class)'; (3) that '[i]t (the refund) must be returned to our patients,' and (4) that '(a) direct patient refund is economically impractical . . . (because) [t]he cost of identifying, locating and mailing to each of the patients seen by the relatively few physicians receiving refunds for the 1976 to 1978 period would exceed the approximately 25 cents per patient visit refund.'"

[6]The word in the order was spelled "subbested," an obvious typographical error.

The fulcrum of Karlin's contentions on appeal turns upon a conspiracy among SOCAP, Dr. Zalta and the insurance defendants to fix medical malpractice premium rates at excessive levels in violation of various provisions of the Insurance Code and to pass those charges on to the patients who constitute the class. Karlin conceives these patients of SOCAP's physician members to be indirect purchasers of the malpractice insurance contracted for by SOCAP and, as such, entitled to the fund received in settlement of SOCAP's lawsuit against the insurance defendants. She asserts she was not required to exhaust administrative remedies. The insurance defendants primarily contend that the ratemaking aspect of the insurance business enjoys unique antitrust immunities embodied in section 1850 et seq., which, coupled with Karlin's lack of standing and her failure to exhaust administrative remedies, are destructive of her claim and justify the judgment of dismissal. SOCAP and Dr. Zalta join in advancing these contentions and also assert that the complaint is facially lacking in allegations which validly charged them with antitrust violations. The insurance defendants, other than Phoenix, focus their arguments on the purported failure of the complaint to state a cause of action for civil conspiracy as well as the inapplicability of the doctrine of intraenterprise conspiracy.

### III. The Business of Insurance—Evolution of the Antitrust Exemption

#### A. *The Federal Background*

The United States Supreme Court in *Paul* v. *Virginia* (1868) 75 U.S. (8 Wall.) 168, 183 [19 L.Ed. 357, 361] held that "[i]ssuing a policy of insurance is not a transaction of commerce" and that the conduct of the business of insurance does not constitute interstate commerce. This left the states free to regulate such business beyond the reach of federal law. (See *Hooper* v. *California* (1895) 155 U.S. 648, 655 [39 L.Ed. 297, 300, 15 S.Ct. 207].) Seventy-six years later, the question was reviewed in *U. S.* v. *Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162] (hereafter *South-Eastern*). To the consternation of the insurance industry, the court concluded that the insurance business was indeed engaged in interstate commerce subject to federal regulation under the commerce clause of the United States Constitution and that the Sherman Antitrust Act was applicable to its operation. Responding to the shock waves produced by this decision, Congress passed the McCarran-Ferguson Act (hereafter McCarran Act) in 1945 expressly declaring that it was in the public interest for the business of insurance to continue under state regulation and specifically exempted such business from the operation of federal antitrust laws to the extent that it was

regulated by state law.[7] A moratorium was provided until January 1, 1948, (and extended until June 30, 1948) to enable the states to exercise their regulatory authority.

The *South-Eastern* case involved ratemaking, the precise holding being that a group of insurance companies acting in concert were subject to the Sherman Antitrust Act. There ensued precipitate state action to implement the McCarran Act and by 1950 every state had enacted rate regulatory legislation. (Keeton, Insurance Law (1971) § 8(a), p. 538. ■ When Congress passed the McCarran Act, it "was mainly concerned with the relationship between insurance ratemaking and the antitrust laws . . ." and "to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation." (*SEC* v. *National Securities, Inc.* (1969) 393 U.S. 453, 458-459 [21 L.Ed.2d 668, 675, 89 S.Ct. 564].) In reviewing the legislative history of the McCarran Act, the United States Supreme Court notes that a paramount motivation of its sponsors was to provide antitrust exemption to cooperative ratemaking activities in the insurance industry; "Because of the widespread view that it is difficult to underwrite risks in an informed and responsible way without intra-industry cooperation, the primary concern of both representatives of the insurance industry and the Congress was that cooperative ratemaking efforts be exempt from the antitrust laws." (*Group Life & Health Ins. Co.* v. *Royal Drug Co.* (1979) 440 U.S. 205, 221 [59 L.Ed.2d 261, 274, 99 S.Ct. 1067].) As shall develop, these same considerations are carried through in the California scheme for casualty insurance ratemaking.

B. *The California Background*

In 1907, California had adopted the Cartwright Act,[8] an antitrust law which was patterned after the Sherman Act and had been relatively dormant until about the time the McCarran Act was enacted. (*Mailand* v. *Burckle* (1978) 20 Cal.3d 367, 376, fn. 8 [143 Cal.Rptr. 1, 572 P.2d 1142].) In 1946, two years after the landmark decision in the *South-Eastern* case, our Supreme Court rendered its decision in *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34 [172 P.2d 867]. In the *Speegle* case, an insur-

---

[7]Title 15 United States Code sections 1011-1015. Section 1012(a) provides that "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." Section 1012(b) provides in relevant part that the Sherman and Clayton Acts shall be applicable to the business of insurance "to the extent that such business is not regulated by State Law."

Section 1013(b) preserves federal jurisdiction over certain conduct regardless of whether such activities are also subject to state regulation. It provides: "Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce,or intimidate, or act of boycott, coercion, or intimidation."

[8]Business and Professions Code section 16700 et seq.

ance agent who had a contract with members of defendant Board of Fire Underwriters claimed that the members had refused to do business with him and threatened to terminate his agency appointment unless he ceased to represent nonboard companies. One of the questions presented was whether plaintiff stated a cause of action under common law rules or under the Cartwright Act prohibiting restraint of trade. The defendants asserted that the state statute was an unconstitutional regulation of interstate commerce. The Supreme Court upheld the constitutionality of the Cartwright Act, holding it to be an implementation of the common law prohibition against combinations in restraint of trade and further held that it was applicable to the business of insurance. In so holding, Justice Traynor pointed out that many states had enacted legislation against combinations seeking to dominate the field of insurance or which "gave their insurance commissioners special powers over insurance rates." He then observed: "*Since there is no such special legislation in California,* the Cartwright Act and the common law must be relied upon for the protection of the public against combinations in restraint of the insurance trade." (At p. 45, italics added.)

### C. *McBride-Grunsky Regulatory Act and Its Legislative History*

In 1947, shortly prior to the expiration of the moratorium on the application of federal antitrust laws to the business of insurance in the absence of state regulation, California enacted the McBride-Grunsky Insurance Regulatory Act (hereafter McBride Act), which was incorporated into the Insurance Code as chapter 9, encompassing sections 1850 to 1860.3. In a historical preface to the California Insurance Code, written by former Insurance Commissioner John R. Maloney and Sidney L. Weinstock, Esq., the authors declare that the McBride-Grunsky insurance rate regulatory legislation "finds its background in the Southeastern Underwriters case, the McCarran Act and the Speegle case." (West's Ann. Ins. Code (1972 ed.) p. LXVII.) ■ ■■■ The preamble to the McBride Act describes it as an act "granting certain immunities under other laws which do not specifically refer to insurance."[9]

It is significant to consider both the legislative concerns and administrative apprehensions attending the adoption of the McBride Act. On the subject of

---

[9]At the hearing on the demurrer, Phoenix made a request that the court take judicial notice of material relevant to the legislative history of the McBride-Grunsky Regulatory Act. It was appropriate for the trial court to consider such material since it "is axiomatic that a general demurrer may consider not only the facts appearing upon the face of the complaint but also any matter of which the court is required to, or may, take judicial notice." (*Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 997 [135 Cal.Rptr. 720].) This includes matter appearing in "[o]fficial acts of the legislative, executive and judicial departments" (Evid. Code, § 452, subd. (c)) and which may consist of materials such as administrative determinations, committee reports, correspondence directed to the Governor's office and testimony at public hearings. (*Post* v. *Prati* (1979) 90 Cal.App.3d 626, 634 [153 Cal.Rptr. 511].) The documentation judicially noticed is in the record before us.

the immunities heralded by its preamble, two sections of the McBride Act specifically immunize certain conduct subsumed by its provisions from prosecution under other laws. Section 1860.1 provides: *"No act done, action taken or agreement made* pursuant to the authority conferred by this chapter *shall constitute a violation of or grounds for prosecution or civil proceedings under any other law* of this State heretofore or hereafter enacted which does not specifically refer to insurance." (Italics added.) This broad immunity is further buttressed against other provisions of the Insurance Code by its tandem counterpart, section 1860.2. That section provides: "The administration and enforcement of this chapter shall be governed solely by the provisions of this chapter. Except as provided in this chapter, *no other law relating to insurance and no other provisions in this code heretofore or hereafter enacted* shall apply to or be construed as supplementing or modifying the provisions of this chapter unless such other law or other provision expressly so provides and specifically refers to the sections of this chapter which it intends to supplement or modify." (Italics added.)

The legislative history of the McBride Act fully underscores recognition of the impact of those sections. On June 11, 1947, while the McBride bill was pending, Deputy Attorney General Harold B. Haas addressed a 14-page letter to then Governor Earl Warren meticulously analyzing the proposed legislation. On several occasions, Mr. Haas refers to the exemption the new act would provide insurers and others from the operation of the Cartwright Act. With respect to "acts in concert" concerning the establishment of rates, Mr. Haas observed that the exemption is extremely broad and expressed his reservations: "The point is that all such acts in concert authorized by the bill are expressly exempted from prosecution or civil proceedings under any law of this State which does not expressly refer to insurance. This, obviously, includes the Cartwright Act concerning combinations in restraint of trade. (*Speegle* v. *Bd. of Fire Underwriters*, 29 Adv. Cal. 27, 121.) The exemption is a very broad one and is specified in the title of the bill, thus meeting any constitutional question. If other business regulations such as the Fair Trade Act are applicable to insurance, the exemption applies to them."

Mr. Haas also invited the Governor's attention to section 1860.1, which he quoted in full. Mr. Haas's communication conveyed this message to Governor Warren in commenting upon section 1860.1: "This, in effect, exempts acts of insurers and other persons done under the provisions of the bill from the Cartwright Act and any other restraint of trade or similar provisions of California law."

The record also contains a memorandum dated June 17, 1947, from Beach Vasey, who was then Governor Warren's legislative secretary,[10] which has

---

[10]Mr. Vasey subsequently became a judge of the Superior Court of Los Angeles County.

reference to the Attorney General's comments concerning the broad exemption insurers would enjoy from prosecution under the Cartwright Act. Judge Vasey iterates that the Attorney General's office was "very much perturbed about this exemption from criminal or civil liability under any law of the state which does not expressly refer to insurance . . . ." Before signing the McBride Act, Governor Warren would appear to have been well advised of its scope and effect.

D. *The Provisions of the McBride Act*

Beyond peradventure, the McBride Act was engendered in a milieu congenial to a qualified antitrust insulation of the ratemaking aspects of the business of casualty insurance. ▉▉▉ An examination of the pertinent provisions of the McBride Act manifest that California has adopted a detailed and an extensive ratemaking scheme to ensure that competition exists in the pricing of casualty insurance, while at the same time permitting concert of activity between insurers and others.

Insurance Code section 1850 provides that the object of the McBride-Grunsky Regulatory Act "is to promote the public welfare by regulating insurance rates . . . to the end that they shall not be excessive, inadequate or unfairly discriminatory." Its announced interest is to "permit and encourage competition between insurers on a sound financial basis" and it expressly "authorize[s] cooperation between insurers in rate making and other related matters." Section 1852 sets standards applicable to casualty ratemaking and provides that the absence of a reasonable degree of competition is a factor to be considered with regard to whether a rate may be determined to be excessive. That section is also concerned that the use of unreasonably low rates might cause insolvency of the insurer, destroy competition or create a monopoly.

Section 1853[11] authorizes insurers to act in concert with each other or with others regarding matters pertaining to ratemaking. Section 1853.6 prohibits agreements between insurers or between insurers and rating organizations to use the same rates. ▉ ▉ ▉▉ ▉ Section 1858 provides that any person believing that he or she has been "aggrieved by any rate

---

[11]Section 1853 provides as follows: "Subject to and in compliance with the provisions of this chapter authorizing insurers to be members or subscribers of rating or advisory organizations or to engage in joint underwriting or joint reinsurance, two or more insurers may act in concert with each other and with others with respect to any matters pertaining to the making of rates or rating systems, the preparation or making of insurance policy or bond forms, underwriting rules, surveys, inspections and investigations, the furnishing of loss or expense statistics or other information and data, or carrying on of research."

charged[12] . . . may request the insurer or rating organization to review the manner in which the rate . . . has been applied with respect to insurance afforded him" and if unsatisfied may seek a hearing before the insurance commissioner. Section 1858.05, enacted during the time of the "medical malpractice crisis," parallels section 1858 and specifically refers to medical malpractice insurance. The Commissioner of Insurance also has remedies provided in sections 1858-1858.7 which are directed to derelictions of the insurer. As to these remedies, the commissioner has the power to take corrective action as he deems necessary and proper (§ 1858.3); he can impose a monetary penalty not exceeding $1,000 for each failure of the insurer to comply up to a total penalty of an aggregating no more than $30,000 (§ 1858.3); he can issue an order specifying in what respect a violation exists and require compliance within a reasonable time thereafter (§ 1858.3, subds. (b), (c)); and he may suspend or revoke the certificate of authority of any insurer who violates the provisions of the act (§ 1858.3) or who fails to comply with his orders (§ 1858.4). Pursuant to sections 1859 and 1859.1, no person or insurer may wilfully withhold information from the commissioner or other interested parties that may affect rates or premiums, and any person or insurer who fails to comply with the final order of the commissioner made pursuant to his powers under the act is subject to a penalty that may be as high as $5,000.

Section 1858.1 authorizes the commissioner to issue to an insurer a notice of noncompliance with the requirements and standards of the McBride Act either after his own examination of the insurer, or after a complaint by a party aggrieved against the insurer under section 1858 "or upon the basis of other information." Section 1858.7 provides that whenever the commissioner makes a determination that a rate is or is not excessive, any complainant, upon written request, may require him to disclose the basis upon which such rate was determined to be excessive or not excessive to such complainant.

 It is manifest that in enacting the McBride Act, the state has opted for the maintenance of a delicate balance between concert of action among

---

[12]Since ratemaking affects premiums, we sometimes use the terms "rates" and "premiums" interchangeably. As used in section 1858, the rate charged obviously refers to the premium charged for the policy of insurance, which may cause an aggrieved party to complain. Technically, a premium and a rate differ in insurance law. A premium means the amount paid to the company for insurance. (*Allstate Ins. Co.* v. *State Board of Equal.* (1959) 169 Cal.App.2d 165, 168 [336 P.2d 961].) A rate "is the formula by which a premium is calculated," the latter being the product of applying "the rate to the specific risk presented by the insured." (*Medical Malpractice* v. *Community General, etc.* (1980) 73 App.Div.2d 867 [423 N.Y.S.2d 666, 668]; see Greene, Risk in Insurance (3d ed. 1973) ch. 26, p. 640.) At other times, for convenience, we integrate the terms premiums and rates into the expression "insurance pricing."

insurers and certain others prescribed in section 1853 and an open competitive system in the setting of insurance rates and ratings upon which the establishment of premiums depend. The guardian of this balance, a sensitive compromise between the pragmatics of insurance ratemaking and the imperatives of antitrust strictures, is the enforcement mechanism created in the McBride Act under the aegis of the Insurance Commissioner. The inherent antitrust risks of price fixing by the authorized concert of action between insurers, and with rating and advisory organizations for the acquisition of risk prediction data, is tempered by the oversight powers of the Commissioner of Insurance to take affirmative action to deal with any abuses that may result either in excessive or inadequate rates or which implicate the conditions of unfettered competition in the market. (See §§ 1852, subd. (a), 1858, 1858.1.) Having established this mechanism for achieving price competition without initial rate regulation by the Insurance Commissioner, the McBride Act provides categorically for immunity from prosecution under other laws that do not specifically contravene it for activities within the McBride purview. (§§ 1860.1, 1860.2.)

## The Unfair Practices Act

In 1959, the Legislature adopted the Unfair Practices Act (hereinafter called UPA). (§ 790 et seq.) Section 790 states the purpose of the act is "to regulate trade practices in the business of insurance . . . by defining . . . such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." Section 790.02 prohibits any person from engaging in "an unfair or deceptive act or practice in the business of insurance" as defined in section 790.03.[13] Section 790.03, subdivision (c) prohibits: "Entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance."

An examination of the legislative history of the UPA, while not as compelling and unambiguous as that of the McBride Act, suggests that it was enacted, pursuant to the McCarran Act, to regulate further in areas of perceived lacunae in the state control of the insurance business. Professor Authur Mertz, reviewing 20 years of experience under the McCarran Act, discusses separately the history of "rating bills" and "bills relating to unfair

---

[13]In its original form, section 790.03 had subdivisions running from (a) to (e). Between 1961 and 1970, subdivisions (f) and (g) were added. In 1972, the Legislature amended section 790.03 by adding subdivision (h), prohibiting unfair claims settlement practices, and enumerating 13 categories of proscribed conduct. In 1975, subdivisions (h)(14) and (h)(15) were added to the list of proscribed conduct.

methods of competition." (Mertz, The First Twenty Years—A Case-Law Commentary on Insurance Regulation Under the Commerce Clause (1965) pp. 8-21.) He points out that these bills were founded on disparate concerns and were directed at different insurance practices. Professor Keeton observes that the states did not respond as quickly to proposals for unfair practice acts as they did to rate regulation and not until 1959, the year of California's adoption of a modified version of a model unfair practices act, was such legislation finally in place in all of the states. (Keeton, Insurance Law (1971) § 8.1a, pp. 538-539.)

▇▇ A comparison of the two acts shows that they identify separate problems and prescribe differing approaches to those problems. The thrust of the UPA is to proscribe the unfair and anticompetitive trade practices enumerated therein, and to authorize a private suit to impose civil liability for damages for a violation of its provisions. It is, however, entirely silent on the subject of the pricing of casualty insurance. Such silence is significant and must be regarded as deferential to the McBride Act which completely, expansively, and out of the exceptional antitrust considerations we have touched on, regulates all activities involving casualty insurance ratemaking including enforcement of anticompetitive activity affecting ratemaking. This conclusion seems particularly appropriate in view of the imperative language of section 1860.2 that ". . . *no other law relating to insurance* and no other provisions in this code heretofore or hereafter enacted *shall apply* to or be construed as supplementing or modifying the provisions of this chapter *unless such other law or other provision expressly so provides* and specifically refers to the sections of this chapter which it intends to supplement or modify." (Italics added.) The UPA gives no such signals, either positively or indirectly. Our scrutiny of the substantive and procedural provisions of the UPA satisfy us that it does not undermine, attenuate or impinge upon the enforcement contours of the McBride Act nor trench on its subject matter. The background and language of the McBride Act clearly suggest a conscious design to avoid a situation in which concerted action in ratemaking might be held to violate antitrust provisions in other statutes. Such conflict is avoided when both acts are considered to blend harmoniously as part of a plenary program for the regulation of anticompetitive insurance activities, but in separate spheres and with separate concerns. Formerly, the Cartwright Act coupled with the common law were the twin pillars of protection against anticompetitive machinations. ▇▇ The case of *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305 [70 Cal.Rptr. 849, 444 P.2d 481] teaches: "These statutes [the Cartwright Act] and the common law which once constituted the 'protection of the public against combinations in restraint of the insurance trade' (*Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 45 [172 P.2d 867]) *are now expressly superseded and contravened by the specific provisions of the*

*Insurance Code.*"[14] (P. 322, italics added.) The McBride Act may be viewed as embodying such specific provisions regulating casualty insurance ratemaking.

█ We are persuaded therefore that the UPA is primarily concerned with the enforcement of (1) unfair insurance settlement claims practices and (2) a broad spectrum of unfair and deceptive practices and anticompetitive activity in the insurance field, not involving, however, the setting of rates for casualty insurance. This latter activity lies exclusively within the province of the McBride Act. This dichotomy is crucial to a resolution of the question of whether plaintiff has effectively pleaded any cause of action which she may presently prosecute against any of the defendants.

█ Although Karlin asserts her action is primarily modeled upon the decisions in *Greenberg* v. *Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994 [110 Cal.Rptr. 470]; *Shernoff* v. *Superior Court* (1975) 44 Cal.App.3d 406 [118 Cal.Rptr. 680] and *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] and that it is primarily founded in antitrust, the relevancy of the McBride Act to her claim turns upon the wrong she alleges, regardless of the fact that it is interleaved with antitrust nomenclature and concepts. (See *Carroll* v. *Puritan Leasing Co.* (1978) 77 Cal.App.3d 481, 487 [143 Cal.Rptr. 772]; *Ideal Hardware etc. Co.* v. *Dept. of Emp.* (1952) 114 Cal.App.2d 443, 448 [250 P.2d 353].) A review of her complaint demonstrates that it is fundamentally directed at the premium rates charged by Phoenix to SOCAP for medical malpractice coverage. It is permeated with allegations that the defendants conspired "to raise, fix and/or stabilize prices for medical malpractice insurance at artificial and noncompetitive levels in the Southern California market" and others of similar import which have been quoted. It is patent from this characteristic language that the focus of plaintiff's case is the charging of excessive insurance premiums and that its gravamen falls squarely within the purview of the McBride Act, which was designed to exclusively regulate the making and use of such rates.

Plaintiff's reliance on three cases dealing with activities denounced by the Unfair Practices Act is inapposite. In *Greenberg* v. *Equitable Life Assur. Society, supra,* 34 Cal.App.3d 994, plaintiffs sued under section 790.03,

---

[14]The *Chicago Title Insurance Company* case dealt with title insurance regulation. Section 1851, subdivision (d) expressly excludes title insurance from the purview of the McBride Act. The McBride Act includes medical malpractice insurance in section 1850.4 by reference to section 108. Section 108 reads in pertinent part: "Liability insurance includes: . . . [¶] (d) Insurance coverage against the legal liability of the insured, and against loss, damage or expense incident to a claim arising out of the death or injury of any person as the result of negligence or malpractice in rendering professional services by any person who holds a certificate or license . . . ."

subdivision (c) which denounces agreements or concerted action to commit "any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance." The plaintiff had alleged that the defendant required applicants for home loans to agree to purchase life insurance from defendant before a loan application would be approved. The court found that the practice resulted in an illegal "tie-in" agreement, constituting coercion in the antitrust sense and consequently an unfair method of competition within the meaning of section 790.03. The court also pointed out that notwithstanding provisions for administrative enforcement of section 790.03, section 790.09 of the act was explicit in preserving the right to a private suit for civil liability irrespective of governmental action. No issue regarding insurance rates was raised and no mention made of the McBride Act.

In *Shernoff* v. *Superior Court, supra,* 44 Cal.App.3d 406, plaintiffs brought a class action for damages against numerous California title insurance companies on allegations that they had conspired to fix the price of title insurance. Relying squarely upon the *Greenberg* case, *Shernoff* held that plaintiffs had stated a claim under the UPA and by reason of the authority given in section 790.09, plaintiffs were not required to exhaust administrative remedies. The McBride Act is not mentioned in *Shernoff*, and not surprisingly, since section 1851, subdivision (d) makes the act expressly inapplicable to title insurance rates.

In *Royal Globe Ins. Co.* v. *Superior Court, supra,* 23 Cal.3d 880, plaintiff filed an action for personal injuries suffered as a result of a fall when she slipped at a food market. She joined as a defendant Royal Globe Insurance Company which had issued a policy of liability to the market. Her complaint against Royal Globe was that it had violated section 790.03, subdivision (h)(5) by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of her claim after liability had become reasonably clear. The cardinal question posed was whether a third party claimant could complain of an unfair claim settlement practice under the UPA. The Supreme Court held that such a cause of action was appropriately prosecuted by plaintiff.

*Royal Globe* obviously presented no issue respecting the pricing of casualty insurance and no discussion of the McBride-Grunsky Act was undertaken. However, Karlin relies upon certain language in the *Royal Globe* opinion which she asserts authorizes her reliance on the Unfair Practices Act as the predicate for her first five causes of action. This language occurs at a point in the opinion in which the court discusses Royal Globe's contention that section 790.09 of the UPA should not be interpreted as authorizing a civil action for violation of a provision of that act. Royal Globe contended

that section 790.09 was merely intended to allow a party to bring a civil action on the basis of authority derived from other provisions of law. After noting a difference in language between the California statute and the model act from which UPA is derived, Royal Globe's contention was rejected in the following language:

"Defendant's contention is contrary to the holdings, of both *Greenberg* and *Shernoff*. Defendant asserts that *Greenberg* is distinguishable because the complaint there was based upon tie-in sales coerced by an insurer, a practice which is illegal even without the prohibition contained in section 790.03. However, the court determined that the general antitrust prohibitions of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) were inapplicable to insurance companies and *that only section 790.03 prohibits insurers from engaging in anticompetitive activity.* (34 Cal.App.3d at p. 999, fn. 2.) Thus, it expressly recognized that *only the act [UPA] prohibits anticompetitive activity by an insurer,* and held that the plaintiff could rely upon the provisions of the act in bringing a private suit for civil damages." (23 Cal.3d at pp. 886-887.) (Italics added.)

Karlin relies strongly on the language of *Royal Globe* to which we have added emphasis. It appears in the matrix of a discussion of coerced tie-in sales which *Greenberg, supra,* 34 Cal.App.3d 994 found to be beyond the pale of the Cartwright Act but within the ambit of section 790.03, subdivision (c) condemning agreements and combinations to commit acts of boycott, coercion or intimidation resulting in restraints of, or monopolies in, the insurance business.

■ It is elementary that language used in an opinion can only be read in the context of the facts and issues then before the court. (*McDowell & Craig* v. *City of Santa Fe Springs* (1960) 54 Cal.2d 33, 38 [4 Cal.Rptr. 176, 351 P.2d 344].) ■ An opinion is not authority for a proposition not considered therein. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) Since none of the three cases cited concerned ratemaking nor a conspiracy to fix rates for casualty insurance, there was no need for the respective courts to deal with the effect of the McBride Act. Where casualty insurance ratemaking is implicated and where the anticompetitive activity involved is a conspiracy to charge excessive insurance rates, it cannot be doubted that the legislative history and precedential case law background validates the conclusion that the explicit language of McBride confers immunities on insurers and others from prosecution under other laws not meeting the criteria of sections 1860.1 and 1860.2. We perceive that the UPA makes no pretension of impinging on McBride's exclusivity in governing acts involving concert of action or anticompetitive activity in connection with casualty insurance ratemaking. For

these reasons, we do not profess to read the cases relied upon as nullifying the McBride Act sub silentio or by implication. We prefer to regard the quoted statements within the context of the facts and circumstances considered and the propositions of law presented by those facts. (See *McDowell & Craig* v. *City of Santa Fe Springs, supra,* 54 Cal.2d 33, 38; *Ginns* v. *Savage, supra,* 61 Cal.2d at p. 524, fn. 2.) When placed in this perspective, it may not be gainsaid that one claiming to be the indirect victim of excessive insurance rates charged to an insured must seek his or her remedies within the framework of McBride.

Karlin directs attention to the fact that after the decisions in *Greenberg* v. *Equitable Life Assur. Society, supra,* 34 Cal.App.3d 994, and *Shernoff* v. *Superior Court, supra,* 44 Cal.App.3d 406, the Legislature amended section 790.03 in 1978 and left undisturbed their construction of that statute as being the only act which prohibits anticompetitive activity by an insurer. She quotes from *People* v. *Hallner* (1954) 43 Cal.2d 715, 720 [277 P.2d 393]:

" 'After the enactment of a statute, when a construction has been placed upon it by the highest court of the state, it will be steadily adhered to in subsequent cases, unless very plainly shown to have been wrong, and more especially where the construction so given is supported by a line of uniform decisions, and where it has been acquiesced in by the legislature for a succession of years.' "

A fatal flaw suffuses this argument,[15] for as we have observed neither of those pre-1978 decisions construed the McBride Act (nor did *Royal Globe* in 1979). It is a quantum leap to suggest that *Greenberg* and *Shernoff* intended to neutralize the McBride Act when neither opinion has any reference to that legislation and to further suggest that a clairvoyant Legislature was aware of, and acquiesced in, this unexpressed judicial intent by its action in amending section 790.03 and its inaction regarding the McBride Act. We can derive no meaningful judicial precedent or legislative intent from decisions concerned with propositions of law and fact outside the ambit of the McBride Act and which do not have occasion to discuss that law. (See *Ginns* v. *Savage, supra,* 61 Cal.2d at p. 524, fn. 2.)

Seeking to disengage defendants from the shelter of the McBride Act, Karlin asserts that she is not complaining necessarily about ratesetting within the insurance industry but is focusing on a conspiracy to fix excessive prices whose protagonists are Phoenix and the defendants SOCAP, *a non-*

---

[15]We do not dwell on the fact that neither *Greenberg* nor *Shernoff* was decided by the highest court of the state.

*insurance entity,* and Dr. Zalta. Those costs, in turn, are passed on to each purchaser of medical services and the profit later divided among the conspirators. She urges that it is crucial to weigh her argument that the issue raised is not the mere amount of the premiums but the anticompetitive manner in which they were fixed by the insurance defendants and SOCAP to "rip-off" the public. She contends that the McBride Act is not only inapplicable to rate fixing where a noninsurance entity is involved but it is by its very nature unable to protect the public from such abuse because Mc-Bride relies on the policyholder, here an alleged co-conspirator, to raise objections to excess ratings. (See § 1858.)

This broadside does not withstand scrutiny. It is to be noted that section 1852 establishes standards which are applicable both to ratemaking and the use of rates. According to the complaint, Dr. Zalta and SOCAP acted as intermediaries on behalf of the physician members to purchase medical malpractice insurance. Such activities are part of the business of insurance. (See *Feinstein* v. *Nettleship Co. of Los Angeles* (9th Cir. 1983) 714 F.2d 928.) It should also be noted that in determining whether a rate used is excessive, inadequate or unfairly discriminatory, consideration may be given to ". . . unabsorbed premium deposits allowed or returned by insurers to their policyholders" (§ 1852, subd. (b)), that is to say, retrospective adjustment of premiums on the basis of favorable loss experience.[16] This factor is a part of the agreement between SOCAP and Phoenix, and the fund here involved stems from such a retrospective distribution. It is axiomatic that the insured or his agent is integrally involved in the use of rates by reason of the nature of the agreements to be reached with the insurer. The relationship between the insurer and the insured and the nature of the policy issued is the very core of the business of insurance. (*SEC* v. *National Securities, Inc., supra,* 393 U.S. 453, 460 [21 L.Ed.2d 668, 676].) Pursuant to his power to enforce rating standards, such agreement between insurer and insured may be examined by the commissioner to determine whether the rates used are excessive and the product of anticompetitive activity to gouge the general public. Such an agreement is within the scope of the McBride Act and the commissioner is empowered to exercise his authority to frustrate such result.[17] It would seem anomalous to apply McBride to the

---

[16]Compare section 1860 which reads as follows: "Nothing in this chapter shall be construed to prohibit or regulate the payment of dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers. A plan for the payment of dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, members or subscribers shall not be deemed a rating plan or system."

[17]By the same token, the commissioner may act if the rates are the product of a scheme to set inadequate premiums since they may threaten the solvency of the insurance carrier and jeopardize its responsibility to its policyholders who depend on its stability for the settlement of their claims.

anticompetitive activity of insurers who agree to use the same rate (§ 1853.6) and yet hold it inapplicable to an insured or to its agent who may be participating in such proscribed conduct as part of an unlawful combination with the insurer. On the other hand, it would be incongruous to apply the statute's exculpatory antitrust aspects to concert of action between insurers and others in the ratemaking field and yet hold that participation by the insured in such an agreement, which goes to the essence of the insurer-insured relationship, is not entitled to the same exculpation. We are of the view, therefore, that a ratemaking or a rate using activity which implicates an insured together with an insurer is governed by the provisions of the McBride Act.[18]

Karlin's claim that the McBride Act depends solely upon the insured to raise objections to excessive rates does not appear to be quite accurate. Section 1858.1 permits the commissioner to act to rectify abuses not only upon complaint from the insured, but after his own examination, or based upon information from others. As we later discuss, the commissioner in fact intervened during the period of the medical malpractice crisis as was contemplated by the statute.

 In sum, we hold that the McBride Act, and not the UPA, applies as to all defendants with respect to the entire gamut of anticompetitive conduct alleged in the complaint.

## IV. PLAINTIFF'S FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES IS A BAR TO THIS ACTION

 Karlin does not allege in her complaint that she has resorted to, much less exhausted, administrative remedies. In point of fact, she contends on appeal that she was not required to exhaust inadequate or nonexistent remedies. She further urges that, in effect, the administrative remedy was concluded when the Insurance Commissioner made his determination in 1976 as to the acceptability of the rates charged by Phoenix to SOCAP. We arrive at a contrary determination.

 In *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715], the judicially created doctrine of exhaustion of administrative remedies was established as a fundamental rule of procedure, the Supreme Court declaring it to be a ". . . jurisdictional prerequisite to resort to the courts." (P. 293.) The doctrine is not an absolute

---

[18]Although SOCAP and Dr. Zalta have taken the position that they are not governed by the McBride Act, our contrary view emerges as a pure question of law on the facts presented. (See *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].)

impediment to resort to the judicial process notwithstanding a failure to pursue administrative remedies. Well-established exceptions exist where the administrative remedy is inadequate (see *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 9 [154 Cal.Rptr. 893, 593 P.2d 838]); where it is unavailable (*County of Los Angeles* v. *Farmers Insurance Exchange* (1982) 132 Cal.App.3d 77, 86 [182 Cal.Rptr. 879]); or where it would be futile to pursue such remedy (*Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 835 [112 Cal.Rptr. 761]). Frequently, courts have stated that there is no administrative remedy to exhaust where a plaintiff is seeking an award of money damages and the administrative remedy makes no provision for damages. (*Lachman* v. *Cabrillo Pacific University* (1981) 123 Cal.App.3d 941, 945 [177 Cal.Rptr. 21]; *Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 968, fn. 19 [182 Cal.Rptr. 176].) Karlin argues this rule is here applicable.

■■■ Notwithstanding the strong, and on occasion decisive, consideration given to the question of whether or not through the administrative process a plaintiff may obtain the functional equivalent of judicial remedies, there is substantial authority which holds that there exist salutary reasons for requiring that the administrative remedy be pursued even though it may not resolve all issues or provide the precise relief requested by plaintiff. (*Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 476 [131 Cal.Rptr. 90, 551 P.2d 410]; *Wilkinson* v. *Norcal Mutual Ins. Co.* (1979) 98 Cal.App.3d 307, 317 [159 Cal.Rptr. 416]; *Leek* v. *Washington Unified School Dist.* (1981) 124 Cal.App.3d 43, 53 [177 Cal.Rptr. 196]; *Link* v. *Antioch Unified School Dist.* (1983) 142 Cal.App.3d 765, 769 [191 Cal.Rptr. 264]; *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977, 982 [88 Cal.Rptr. 533].) The exhaustion doctrine is viewed with favor in those cases because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency. These aspects were explained in *Bozaich* v. *State of California* (1973) 32 Cal.App.3d 688, 698 [108 Cal.Rptr. 392]: "The doctrine of exhaustion of administrative remedies evolved for the benefit of the courts, not for the benefit of litigants, the state or its political subdivisions. It rests 'on considerations of comity and convenience,' and its basic purpose is to secure a 'preliminary administrative sifting process' [citation] to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief. [Citation.]" The matter is more forcefully put in *Westlake Community Hosp.* v. *Superior Court, supra,* 17 Cal.3d 465, where the Supreme Court stated: ". . . even if the absence of an internal damage remedy makes ultimate resort to the courts inevitable [citation], the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review." (P. 476.)

 Whether the exhaustion doctrine is to be applied in a particular instance because of its extreme utility to the court and the agency itself to initially engage administrative expertise, or is to be held inapplicable because of the alleged inadequacy of the administrative remedy, has been determined by a qualitative analysis on a case-by-case basis with concentration on whether a paramount need for agency expertise outweighs other factors. In order to proceed with such an analysis, we digress to briefly consider the situation which ultimately created the groundwork for this litigation.

 That there existed in California, immediately prior to and during 1975, a phenomenon commonly described as "the medical malpractice crisis," which was evidenced by soaring increases in the cost of liability insurance within the medical profession, causing doctors' protests against these increases in the form of strikes and other resistive tactics, is both a matter for judicial notice (Evid. Code, § 452, subd. (g)) and amply documented. (*Review of Selected 1975 California Legislation* (1976), 7 Pacific L.J. 237, 544-545.)[19] The pleading directs our attention to the situation. The circumstances are epitomized by Assemblyman Barry Keene, formerly Chairman, Health Committee, California Assembly, who noted that (1) the medical malpractice insurance industry was in a critical condition in 1975 because it had failed, since 1957, to charge doctors sufficient premiums to assure adequate reserves against future claims; (2) by 1975 some insurers of California physicians had either abandoned the malpractice insurance market or raised premiums by several hundred percent upon their determination that claims payouts and sales expenses amounted to $180 for each $100 of collected premiums; and (3) during 1975 the health of people of California was threatened when same doctors, believing they could neither absorb additional premiums nor pass them on to their patients, refused to practice their profession. (Keene, *California's Medical Malpractice Crisis, A Legislator's Guide to the Medical Malpractice Issue* (Geo. U. and Nat. Conf. of State Legs. 1976) at pp. 27, 29.)

The response of the Legislature to this crisis after having been convened in extraordinary session was the enactment of the Medical Injury Compensation Reform Act (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 1, p. 3949 et seq.). The preamble to the act (hereinafter MICRA) states in part:

---

[19]In point of fact, this crisis was nationwide in scope (See Sheehan, *The Medical Malpractice Crisis: Purposed Solutions* (1975) 11 Forum 80, where it is stated: "The spiraling cost of Medical Malpractice Liability Insurance to physicians and surgeons in practically all states and the cancellation of the State Medical Society Association programs of insurance in the states of New York, Massachusetts, Florida, Idaho and Pennsylvania . . . complicated by the withdrawal from the malpractice market by many insurance carriers—has produced a crisis of major proportions in the United States."

"The Legislature finds and declares that there is a major health care crisis in the State of California attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for the medically indigent, a denial of access for the medically marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state." (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 12.5, p. 4007.)

■■■ The reforms undertaken by MICRA were designed to improve the quality of medical care, strengthen procedures for reviewing medical malpractice insurance rates and place restrictions on medical malpractice litigation to make it more economically manageable.[20] (*Review of Selected 1975 California Legislation* (1976) 7 Pacific L.J. 237, 545.)

We have touched upon this background to the events recited in plaintiff's complaint of unprecedented rate hikes for medical malpractice insurance and withdrawals from that market of insurers willing to underwrite such risks at prior prevailing rates to place in perspective the response of the parties and the Insurance Commissioner. Thus, when medical malpractice insurance rates were the cynosure of extraordinary scrutiny by the medical profession, their patients and the Legislature,[21] Karlin's complaint informs us how the administrative machinery functioned to achieve the objectives of the McBride Act. We know from plaintiff's complaint that, in 1973, the existing malpractice insurance carrier, Hartford, intended to raise SOCAP's malpractice rates 100 percent. SOCAP objected, and obtained an insurer (defendant Phoenix) for 1974 whose premium rates were raised by only 30 percent of the prior level. SOCAP vigorously resisted subsequent efforts to

---

[20]In an article by Barry A. Oster entitled *Medical Malpractice Insurance* (1978) 45 Ins. Couns. J. 228, the author traces the financial roots of the medical malpractice crisis to a ratemaking dilemma and finds the underlying problem to have been in part due to the so-called "long tail" factor, to the expansion of the law of tort liability against doctors in unexpected forms and because the small number of insureds does not allow a proper statistical base for sophisticated actuarial techniques. The author observes (p. 230): "The 'long tail' problem stems from the unusual length of time that elapses between the act of malpractice and the time in which the claim is filed and settled. The 'tail' associated with malpractice claims has been growing in recent years and the average pay out period has been estimated to have increased to 6.5 years . . . . In light of the delay involved in computing an average cost per claim, the rising number of claims filed per year, and the increasing cost of settlements in court judgments, the data computed from a small base of insureds, that is often more than six years old, is of highly questionable actuarial value. Given this experience of the 1960's and the early 1970's, it is not surprising to note that an availability crisis in malpractice insurance has resulted. . . .

". . . . . . . . . . . . . . . . . . . . . .

"Thus an insurance premium for a given policy year must be calculated to withstand changes in the legal and social environment as well as inflationary trends, if it is to be sufficient to cover the claims being settled several years after the initial policy year."

[21]We do not speculate whether MICRA had any affirmative impact in promoting the profitability that led to the creation of the fund which plaintiff claims.

increase premiums. We know that, in 1975, the defendant insurers were thwarted in their efforts to accomplish a premature premium increase by the intervention of the Insurance Department. When Phoenix attempted in 1976 to increase premiums by 486 percent, the statutory mechanism was placed in operation once again and the Insurance Commissioner made an express determination that an increase of up to 327 percent would not be excessive, and Phoenix charged no more than that amount. ■■■ A premium approved by the Insurance Commissioner cannot be deemed to be excessive. (*Keniston* v. *American Nat. Ins. Co.* (1973) 31 Cal.App.3d 803, 811 [107 Cal.Rptr. 583].) Denuded of its conclusionary rubrics, the underlying facts of plaintiff's complaint show that through the efforts of the concerned parties, the statute functioned to provide the administrative redress contemplated.

■■■ What is fundamentally at issue, despite the antitrust overlay of Karlin's complaint, is whether excess premium rates were charged by Phoenix at the time they were established. A resolution of this question inevitably involves a searching inquiry into the factual complexities of medical malpractice insurance ratemaking and the conditions of that market during the turbulent time here involved. The McBride Act comprises a pervasive and self-contained system of administrative procedure for the monitoring both of insurance rates and the anticompetitive conditions that might produce such rates. Whether or not SOCAP was entitled to a rate lower than the premium charged by Phoenix, given the market conditions then prevailing, is a matter singularly within the technical competence of the Insurance Commissioner through the enlistment of agency resources. Against this background, Karlin is hard put to maintain that her initial recourse should not be to the administrative body controlling and regulating casualty insurance ratemaking. As we are told in *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 323 [70 Cal.Rptr. 849, 444 P.2d 481], the regulation of insurance rates charged ". . . has traditionally commanded administrative expertise applied to controlled industries."

In light of these considerations, decisions which have rejected the argument Karlin makes concerning the inadequacy of an administrative remedy which does not provide damages as obviating the exhaustion requirement and which have made determinations predicated on the policy to be served by the exhaustion doctrine in the particular instance seem here germane and controlling. In *Westlake Community Hosp.* v. *Superior Court, supra,* 17 Cal.3d 465, a doctor was denied admission to the staff of Los Robles Hospital and her privileges at Westlake Community Hospital were revoked. The doctor complained that the denial of staff privileges interfered with her right to pursue her livelihood and was part of a conspiracy to restrain competition. The doctor brought an action sounding in tort for monetary damages.

On the doctor's application for a writ of mandamus, the Supreme Court concluded that the doctor's failure to exhaust her administrative remedies at Westlake Community Hospital defeated her action although the available remedy would not include a damage award. The Supreme Court adopted as a matter of first impression the rule prevailing in other jurisdictions which applied general exhaustion principles to private remedies which did not provide for damage awards, notwithstanding that the doctor's claim sought only tort damages and not reinstatement or admission. The rationale of the Supreme Court's decision rested in part upon its recognition of the expertise of the administrative tribunal: "Moreover, by insisting upon exhaustion even in these circumstances, courts accord recognition to the 'expertise' of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance. [Citation.] Finally, even if the absence of an internal damage remedy makes ultimate result to the courts inevitable [citation], the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and providing a record which the court may review." (P. 476.)

In *Wilkinson* v. *Norcal Mutual Ins. Co., supra,* 98 Cal.App.3d 307, the court had occasion to deal with the administrative remedies provided by the McBride Act in reviewing a judgment of dismissal following a motion for summary judgment. Briefly stated, Dr. Wilkinson's medical malpractice insurance carrier, Norcal, issued him a restricted policy with conditions omitting coverage for neurosurgery and orthopedic surgery. As a result, his staff privileges at certain hospitals could not be exercised as to the latter specialties. Dr. Wilkinson then filed a complaint against Norcal, alleging damages because of the excessive premium rates charged him under the policy and because of the conditions imposed by the policy. The trial court granted Norcal's motion for summary judgment on the ground that Dr. Wilkinson failed to exhaust his administrative remedies under section 1858 as well as section 11587.[22] Among Dr. Wilkinson's several contentions on appeal was his claim that he was not required to exhaust administrative remedies which were inadequate, inasmuch as the Insurance Commissioner could not award the damages he requested. In rejecting this argument, the court stated: "A similar contention was addressed in *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 475-477. . . . The Supreme Court in *Westlake* held that even though there was an absence of a damage remedy in the administrative procedure which made ultimate resort to the courts inevitable, exhaustion was required. Though that case dealt with the internal remedies of an organization the same principles are applicable here. At pages 476-477, the Supreme Court set forth at length the salutary purposes that

---

[22]Section 11587 provides an administrative remedy to a licensed medical practitioner aggrieved by any malpractice insurance rate adopted by his insurer.

would be served by applying the exhaustion doctrine. They apply with equal force to this case." (*Wilkinson, supra,* at p. 317.) Holding that failure to exhaust an administrative remedy is a jurisdictional rather than a procedural defect, the court affirmed the judgment of dismissal. (*Id.,* at p. 318.)

The principle is likewise endorsed in *County of Los Angeles* v. *Farmers Insurance Exchange, supra,* 132 Cal.App.3d 77, in which a class action was maintained for the purpose of enjoining a practice known as territorial rating under which it was alleged that residents of certain neighborhoods are charged discriminatory and excessive rates for automobile insurance based primarily on where they garaged their automobile. Since only injunctive relief rather than damages was asked for, the court's holding that the administrative machinery of the McBride Act provided an adequate remedy and that plaintiff's failure to exhaust such remedies justified the dismissal of the action by the trial court does not directly bear on the subject matter under consideration. The court took occasion, however, to observe: "Moreover, the Insurance Commissioner and the Department of Insurance possess sophisticated bodies of expertise in this field which make them particularly able to handle these matters." (*County of Los Angeles* v. *Farmers Insurance Exchange, supra,* at p. 87.)

Karlin's reliance on *Greenberg, supra,* 34 Cal.App.3d 994 and *Shernoff, supra,* 44 Cal.App.3d 406, misses the mark. As we have seen, plaintiff in those cases pursued remedies under the UPA. ▪ Unlike the McBride Act, section 790.09 expressly provides a judicial remedy alternate to, and cumulative with, the administrative one. In such case, the aggrieved party may elect the judicial avenue. (*Scripps etc. Hospital* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 669, 673-674 [151 P.2d 109, 155 A.L.R. 360].) Reliance on *Ramos* v. *County of Madera* (1971) 4 Cal.3d 685 [94 Cal.Rptr. 421, 484 P.2d 93] and *Diaz* v. *Quitoriano* (1969) 268 Cal.App.2d 807 [74 Cal.Rptr. 358], where class actions were brought without exhausting administrative remedies, is not helpful. In those cases, sections of the Welfare and Institutions Code were analyzed and it was concluded that the administrative remedies provided required individualized activities. In each case plaintiff was prosecuting a class action. Both courts held that there was no failure to exhaust an administrative remedy for class relief where no such administrative remedy existed. However, in an appropriate case, proponents of a class action have been required to exhaust administrative remedies. (*County of Los Angeles* v. *Farmers Insurance Exchange, supra,* 132 Cal.App.3d 77; *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977, 983 [88 Cal.Rptr. 533]; *Mountain View Chamber of Commerce* v. *City of Mountain View* (1978) 77 Cal.App.3d 82, 96 [143 Cal.Rptr. 441].)

█ The rule of exhaustion of administrative remedies applies equally to an action for declaratory relief or for equitable relief. (*People* v. *Coit Ranch, Inc.* (1962) 204 Cal.App.2d 52, 59 [21 Cal.Rptr. 875]; *Dunham* v. *City of Westminster* (1962) 202 Cal.App.2d 245, 249-250 [20 Cal.Rptr. 772].)

█ We conclude, therefore, that Karlin's failure to exhaust McBride Act remedies forecloses her resort to the judicial process. Our reasons are rooted in the considerations we here epitomize.

During the time frame embraced in the pleadings, an emergency existed with regard to delivery of medical services to the public at large because of prohibitive medical malpractice insurance rates and a dearth of carriers willing to underwrite such risks at prior prevailing rates. Ratemaking and the structure of premiums for casualty insurance is a complex matter and the McBride Act delegates regulatory oversight to the Insurance Commissioner pursuant to statutory standards and provisions that are sensitive to the need for balance between cooperation and competition between insurance carriers and others in the marketplace. In considering a claim that insurance rates are excessive, it is indispensable that the expertise of the insurance commissioner and the agency's staff be initially engaged to make such review. The commissioner's determination with respect to controverted rates could not only be of inestimable value to a court should trial be inevitable, but might eliminate the need for a trial, or might resolve major elements of dispute. For example, as regards the case at hand, the commissioner's findings, if supportable—(1) that the premiums charged by Phoenix were not excessive, (2) that competition among insurance carriers languished, if it did, because of the rigors of the then existing market rather than by contrivance or unlawful combination, and (3) that the profitability experience refund that created the fund in controversy was based on factors and considerations satisfying section 1852, subdivision (b)—might obviate entirely or at the least narrow the compass of further litigation. Determinations to the contrary would be of equal benefit in providing an administrative record. Furthermore, the commissioner had invoked his authority in 1975 to stifle a threatened increase of premiums and, in 1976, he had set the limits of a permissible increase. With this past background of activity and interest on the part of the administrative agency, we are of the opinion that the aspects of the exhaustion doctrine adopted in *Westlake, supra,* 17 Cal.3d 465, and *Wilkinson, supra,* 98 Cal.App.3d 607, is most suitably applied here by mandating a resort to the administrative process in advance of instituting judicial proceedings.[23] In so holding, we not only assist in promoting ad-

---

[23]A finding that the activities complained of were authorized under the McBride Act might call into play the immunities of sections 1860.1 and 1860.2 against any civil claim.

ministrative consistency in an area in which the agency has already exercised responsibility, but give appropriate affect to the holding of the Supreme Court in *Westlake Community Hosp.* v. *Superior Court, supra,* 17 Cal.3d at page 476: "Moreover, by insisting upon exhaustion even in these circumstances, courts accord recognition to the 'expertise' of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance. [Citation.] Finally, even if the absence of an internal damage remedy makes ultimate result to the courts inevitable [citation], the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and providing a record which the court may review."

The fact that in 1976 the Insurance Commissioner conducted hearings regarding certain of the rates which Karlin contends were excessive does not connote that administrative remedies have already been exhausted. The commissioner has had no opportunity to consider Karlin's claims that a premium increase was made in 1977 when a premium reduction in fact was called for, or that rates in subsequent years were excessive, or the legitimacy of the arrangement between SOCAP and Phoenix for a profitability experience refund, or that a conspiracy existed between Phoenix and SOCAP and Dr. Zalta to increase malpractice insurance premiums at the expense of Karlin's class.

## DISPOSITION

Since the failure to exhaust administrative remedies is an incurable jurisdictional defect, the court was correct in its order of dismissal.

The judgment is affirmed.

Feinerman, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied April 24, 1984, and appellant's petition for a hearing by the Supreme Court was denied June 14, 1984. Bird, C. J., was of the opinion that the petition should be granted.