[No. G019178. Fourth Dist., Div. Three. Nov. 25, 1996.]

RUTH MILLER et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
AMERICAN HONDA MOTOR CO., INC., et al., Real Parties in Interest.

## COUNSEL

Lawrence Silver, Mark E. Field, Rutan & Tucker, Milford W. Dahl, Jr., and Matthew K. Ross for Petitioners.

Wittman, Mitchell & Skola, Arthur H. Skola and Suzanne R. Varco as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

O'Neill, Lysaght & Sun, Brian A. Sun, Robert L. Meylan, Horvitz & Levy, David M. Axelrad and John A. Taylor, Jr., for Real Parties in Interest.

## Opinion

**SILLS, P. J.—**

### I. Introduction

Sometime after petitioners Ruth and Roger Miller bought a Honda dealership in Huntington Beach they were sued for not making payments to the sellers. The Millers then filed a cross-complaint against Honda[1] for fraud and unfair business practices. In essence, the Millers alleged that they could not make any money because they refused to bribe Honda executives to obtain their fair share of popular Honda models. On demurrer, the trial court stayed the cross-complaint indefinitely, pending review by an administrative agency known as the California New Motor Vehicle Board.[2] The Millers then brought this writ proceeding.

To this date, a solid phalanx of Court of Appeal decisions have held that *all* disputes between new car dealers and manufacturers must be litigated first with the New Motor Vehicle Board, not in state court.[3] (See *Yamaha Motor Corp.* v. *Superior Court* (1986)185 Cal.App.3d 1232 [230 Cal.Rptr. 382] (*Yamaha I*); *Yamaha Motor Corp.* v. *Superior Court* (1987) 195 Cal.App.3d 652 [240 Cal.Rptr. 806] (*Yamaha II*); *Ray Fladeboe Lincoln-Mercury, Inc.* v. *New Motor Vehicle Bd.* (1992) 10 Cal.App.4th 51 [12 Cal.Rptr.2d 598]; *Mathew Zaheri Corp.* v. *Mitsubishi Motor Sales* (1993) 17 Cal.App.4th 288 [21 Cal.Rptr.2d 325].) One decision, in dicta, has indicated to the contrary. (*Ri-Joyce, Inc.* v. *New Motor Vehicle Bd.* (1992) 2 Cal.App.4th 445, 455 [3 Cal.Rptr.2d 546].)

Given the authority already extant, this would ordinarily be an easy case. The trial court followed *Yamaha I, Yamaha II, Ray Fladeboe* and *Mathew*

---

[1]American Honda Motor Co., Inc., and Honda North America, Inc., to be precise.

[2]Initially, the New Motor Vehicle Board (the Board) was created as an administrative agency in 1967 by the enactment of Vehicle Code section 3000 et seq. (Stats. 1967, ch. 1397, § 2, p. 3261 et seq.) The Board was initially named the New Car Dealers Policy and Appeals Board. In 1973 Vehicle Code section 3000 et seq. was amended to create the new Board. One of the purposes behind the amendment was to assist independent new car and motorcycle dealers by preventing "undue control" by vehicle manufacturers. (Stats. 1973, ch. 996, § 1, p. 1964.)

The crux of the statutory scheme setting up the Board is found in section 3050, subdivision (c) of the Vehicle Code, which preceded the 1973 amendment. That statute states (and stated even before the 1973 amendment) that the Board shall "[c]onsider *any matter* concerning the activities or practices of any person applying for or holding a license as a new motor vehicles dealer, manufacturer . . . distributor . . . or representative pursuant to Chapter 4 (commencing with Section 11700) of Division 5 submitted by any person . . . ." (Italics added.)

All undesignated statutory references in this opinion are to the Vehicle Code.

[3]For ease of reading we use the phrase "new car dealer" to refer to "new motor vehicle dealers."

*Zaheri* (as it was bound to do under *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]) and, under those decisions, reached a correct result. Here, however, the petitioners raise an issue not considered in any of the published decisions so far—their right to a jury trial. Intuitively at least, it would seem that if one has a *right* to a trial by jury, a requirement that one take a detour via an administrative agency which could, at best, only render an advisory decision on the dealer's common law claims, is both a waste of time and, indeed, a "tax" on the right to a jury trial.[4]

Well, not exactly. As explained by our Supreme Court, such detours may be justified under the doctrine of "primary jurisdiction" when there is a "paramount need for specialized agency review." (See *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 401 [6 Cal.Rptr.2d 487, 826 P.2d 730].) Under that doctrine, a trial court may avail itself of the specialized expertise of an administrative agency before hearing a matter—the agency in effect becomes a kind of special master for the trial court. Here, it appears that there *may* indeed be such a paramount need. However, because the trial court considered itself bound by the Court of Appeal decisions which stand for a per se rule that new car dealers must *always* seek agency review before presenting any court claims, the trial court did not exercise its discretion as to whether *it* desired the benefits of specialized agency review afforded by the primary jurisdiction doctrine. We therefore grant the requested writ to provide the trial court that opportunity.

## II. DISCUSSION

### A. *Prior Case Law on the Board's Authority*

A brief review of the Court of Appeal decisions is necessary to establish the context of the instant proceeding, and show why the trial court stayed all proceedings on the cross-complaint.

In *Yamaha I*, a motorcycle dealership sued a manufacturer for breach of a franchise agreement, breach of the implied covenant of good faith and fair dealing, and intentional interference with prospective business advantage because the manufacturer refused to sell a certain new product to the dealer, while at the same time selling to competing dealers in the area. The manufacturer's demurrer was overruled, but the appellate court directed that it be sustained. The Court of Appeal styled the breach of contract action as, essentially, a challenge to a modification of the franchise agreement, and

---

[4]A "tax" in the sense that the time and legal expense necessary to go through the process places a substantial additional cost on the presentation of the common law claim to a jury.

therefore squarely within the Board's power to hear such protests. (See 185 Cal.App.3d at p. 1241, citing § 3060.) Because there was a need for a factual determination regarding whether there was good cause for any such franchise modification, and the Board was "the administrative forum authorized to make such determinations," the court concluded that the dealer's failure to exhaust its remedy with the Board precluded judicial relief. (*Yamaha I*, *supra*, 185 Cal.App.3d at p. 1242.)

In one paragraph at the end of the opinion, the court confronted the dealer's claims that Yamaha had abandoned advertising and promotions of its other products in bad faith. The court reasoned that because the Board is empowered under section 3050, subdivision (c) to hear "any matter" concerning a new car or motorcycle dealer and its manufacturer, the dealer's failure to exhaust administrative remedies was fatal as well. (*Yamaha I*, *supra*, 185 Cal.App.3d at pp. 1242-1243.)

Another panel in another district had occasion to consider the implications of *Yamaha I* in *Yamaha II*, decided almost a year later. There, a financing company sued a couple who were former motorcycle dealers for breach of finance agreement. The couple cross-complained against the manufacturer for a number of common law causes of action, including breach of contract, fraud, and interference with business relations. These claims were based on assertions that the manufacturer had unjustifiably terminated certain contracts, sued for past due amounts, and seized inventory, thus putting the dealers out of business; additionally, the manufacturer had interfered with their attempt to sell the dealership to a third party.

The manufacturer sought a writ of mandate requiring the trial court to sustain its demurrer, which the appellate court, as it had done in *Yamaha I*, granted. Once again, the "any matter" phrase in section 3050, subdivision (c) proved fatal to the dealers' judicial action. There was "considerable overlap" between the allegations of the cross-complaint and activities within the purview of the Board. Specifically, the "gravamen" of the former dealers' claim consisted of activity prohibited by two sections of the Vehicle Code[5] within the purview of the Board under section 3050, subdivision (c).[6] In the process the *Yamaha II* court relied on *Yamaha I* to conclude that the exhaustion of administrative remedies was a condition precedent to judicial relief. (See *Yamaha II*, *supra*, 195 Cal.App.3d at p. 657.)

The next case in the phalanx was *Ray Fladeboe Lincoln-Mercury, Inc.* v. *New Motor Vehicle Bd.*, *supra*, 10 Cal.App.4th 51. Unlike the *Yamaha* twins,

---

[5] Sections 11713.2 and 11713.3.

[6] The court pointed out that section 3050, subdivision (c) gives the Board power over matter pursuant to chapter 4 of division 5 of the Vehicle Code, which commences with section 11700.

*Ray Fladeboe* involved a case where the parties had already undergone the administrative process. There, the Board had approved the termination of a Jaguar dealership and rejected a former dealer's petition for damages arising out of the manufacturer's allocation of vehicles. The dealer contended that the Board did not have jurisdiction under section 3050 to arbitrate his claim that the manufacturer wrongfully underallocated vehicles. The dealer sought a petition for writ of administrative mandate, which was denied, and then appealed the judgment denying that petition.

In affirming the judgment the court canvassed the *Yamaha* cases, disposed of a claim based on the *Ri-Joyce* case (which we discuss below), then added the thought that any other result would allow dealers to circumvent the jurisdiction of the Board "through artful pleading," wreak havoc with the exhaustion of remedies doctrine, and defeat a public policy favoring resolutions of franchise disputes by the Board. (*Ray Fladeboe Lincoln-Mercury, Inc.* v. *New Motor Vehicle Bd., supra,* 10 Cal.App.4th at pp. 55-56.)

The last case in the necessity-to-exhaust series is *Mathew Zaheri. Mathew Zaheri* involved a Mitsubishi dealer who lost his franchise after a company audit suggested massive warranty fraud. The dealer sued on various causes of action including breach of contract, slander and trade libel. The manufacturer demurred on the exhaustion doctrine, the trial court dismissed the action, the dealer appealed, and *then* decided to file a dealer petition with the Board.

After dispensing with the question of whether the appeal should be dismissed because of the belated petition, the court reviewed the prior case law, including the effect of the isolated *Ri-Joyce* decision (see *Mathew Zaheri Corp.* v. *Mitsubishi Motor Sales, supra,* 17 Cal.App.4th at pp. 293-294), then resolved the case in one paragraph on page 295 of the opinion. Noting that whether exhaustion of administrative remedies is determined by a " 'a qualitative analysis on a case-by-case basis with concentration on whether a paramount need for agency expertise outweighs other factors,' " the court concluded that an administrative hearing by the Board was clearly called for: Warranty service charges are clearly within the Board's authority (see § 3065), and an administrative hearing would both facilitate a complete record and promote judicial efficiency. (*Mathew Zaheri Corp., supra,* 17 Cal.App.4th at p. 295, quoting *Karlin* v. *Zalta* (1984) 154 Cal.App.3d 953, 981 [201 Cal.Rptr. 379].) The court ended its decision with the comment that if the Board should find in favor of the dealer, yet be unable to afford it "full common law relief," the dealer could *still* file a tort claim in court. (*Mathew Zaheri Corp., supra,* 17 Cal.App.4th at p. 295.)

We now come to *Ri-Joyce, Inc.* v. *New Motor Vehicle Bd., supra,* 2 Cal.App.4th 445, the one decision which said something which contradicts

the idea a new car dealer must absolutely exhaust administrative remedies before any recourse may be had to state court. *Ri-Joyce* was a case where the dealer went first to the Board concerning its claim that the manufacturer was undercutting its business by allowing a new, competing dealer in his area. The Board refused to even consider his claim, but the trial court granted a peremptory writ of mandate commanding it to. The *Board* appealed, and most of the opinion is devoted to a discussion of the merits of the contract dispute and a demonstration the Board was required to hear the dispute. But, in passing, on page 455 of the opinion, the court observed: "To the extent [the dealer] may be relying upon an estoppel or perhaps a claim of fraud, the argument is addressed to the wrong forum. The Board is a quasi-judicial administrative agency of limited jurisdiction. [Citation.] It does not have plenary authority to resolve any and all disputes which may arise between a franchisor and franchisee. The Board's jurisdiction under section 3060 encompasses disputes arising over the attempted termination, replacement or modification of a franchise agreement. Claims arising from disputes with other legal bases must bedirected [*sic*] to a different forum."

As the *Mathew Zaheri* court pointed out, the language is "pure dictum." (See *Mathew Zaheri Corp.* v. *Mitsubishi Motor Sales, supra,* 17 Cal.App.4th at p. 294.) The *Ri-Joyce* court had no occasion to opine on the scope of the Board's authority, or whether a fraud claim was within that authority. Nor did the court address the exhaustion issue. Then again, no published decision has addressed how the Board's authority interacts with the right to a jury trial.

### B. *Right to a Jury Trial*

#### 1. *Occupation of the Field*

■ There is, of course, no doubt that the Legislature can take common law claims which would otherwise entitle a litigant to a jury trial and subject them to the exclusive jurisdiction of an administrative agency. The workers' compensation system is the classic example on point.

However, as the Supreme Court decision in *Rojo* v. *Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373] illustrates, exhaustion of administrative remedies is only required when the Legislature intends an agency to occupy a certain field *exclusively.* (See *id.* at p. 81.) "The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject." (*Id.* at p. 80, citing *I. E. Associates* v. *Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].) By this token, "where a statutory remedy is provided

for a preexisting common law right, the newer remedy is generally considered to be cumulative, and the older remedy may be pursued at the plaintiff's election." (*Rojo, supra,* 52 Cal.3d at p. 79.) That is, no exhaustion is required.

*Rojo* involved a set of common law claims arising out of sexual harassment by a physician of two employees. The physician was granted summary judgment on the ground the employees had not exhausted their administrative remedies with the Department of Fair Employment and Housing under the Fair Employment and Housing Act (FEHA). After ascertaining that FEHA does not have a " 'pervasive and self-contained system of administrative procedure' " for the general regulation of discrimination in the employment context (see 52 Cal.3d at p. 87, quoting *Karlin* v. *Zalta, supra,* 154 Cal.App.3d at p. 983), the *Rojo* court concluded that an employee "could proceed directly to court" on common law claims arising out of employment discrimination. (*Rojo* v. *Kliger, supra,* 52 Cal.3d at p. 88.)

*Rojo* is, however, not the only Supreme Court decision which articulates principles germane to the case before us. In *McHugh* v. *Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91], the court had occasion to deal directly with the question whether administrative adjudication of common law claims violates the state Constitution's jury trial provision. *McHugh* arose out of the administrative apparatus set up by the City of Santa Monica to administer its rent control scheme. Under the scheme, the Santa Monica Rent Control Board was empowered to allow tenants to deduct penalties from future rent payments. Two tenants filed an administrative complaint alleging their landlord charged them excess rent. The rent control board awarded them treble damages which the tenants could immediately use to offset their rent. The landlord then filed a petition for writ of mandate with the court. In the course of the litigation a group of other landlords intervened, arguing they had a right to jury trial in any case for damages or penalties.

After reviewing federal and out-of-state decisions on the right to jury trial in an administrative context, the *McHugh* court announced this rule for California: "Once a court has determined that exercise of a challenged administrative power meets the 'substantive limitations' requirement imposed by the state constitution's judicial powers doctrine—i.e., the challenged activities are authorized by statute or legislation, and are reasonably necessary to, and primarily directed at, effectuating the administrative agency's primary, legitimate regulatory purposes—then the state constitution's jury trial provision does not operate to preclude administrative adjudication." (49 Cal.3d at p. 380.)

Significantly, however, earlier in the opinion the *McHugh* court also made it clear that claims "extraneous" to an agency's "regulatory functions," (such as, in *McHugh*, a landlord's common law counterclaims against a tenant) could be litigated in court because those claims would not "reasonably effectuate" the agency's regulatory purpose and would, in fact, shift the board's focus from a narrow one (the enforcement of rent levels) to a "broad range" of disputes "traditionally resolved in the courts." (49 Cal.3d at pp. 374-375.)

■ Reading *Rojo* and *McHugh* together, it is clear that the Millers' jury trial claim necessarily rests on whether the relevant administrative agency, here the Board, was established by the Legislature to adjudicate *all* disputes between new car dealers and manufacturers, or whether the Legislature had perhaps a slightly more modest role in mind.

That question, in turn, boils down to the scope of the phrase "any matter" as used in section 3050. The statute opens with the words, "The Board shall do all of the following:" and enumerates a list of duties the Board is to perform. The "any matter" phrase appears in third set of duties in the list, subdivision (c): "Consider any matter concerning the activities or practices of any person applying for or holding a license as a [new car dealer, distributor or manufacturer] pursuant to Chapter 4 (commencing with Section 11700) of Division 5 submitted by any person." (§ 3050, subd. (c).) The statute then elaborates on the various things the Board can do after considering such matter (see § 3050, subd. (c)(1)-(3)). After the third set of duties listed in subdivision (c), the statute finishes up with a fourth set, subdivision (d), which is to hear and consider protests "within the limitations and in accordance with the procedure provided" presented by a new car dealer pursuant to certain sections, namely section 3060, 3062, 3064 or 3065.

The structure of the statute reveals that the phrase "any matter" in subdivision (c) of section 3050 was not intended to confer sweeping or (to use the *Ri-Joyce* court's phrase) "plenary" power on the Board to adjudicate *every* matter between a new car dealer and a manufacturer. If the Legislature had intended *that*, subdivision (d) (directing the Board to hear protests presented by franchisees pursuant to certain statutes) would be utterly unnecessary, as would the limiting phrase in subdivision (c) concerning matters "pursuant to Chapter 4 . . . of Division 5."

Furthermore, a construction of the statute which gives the Board plenary power ignores the implications of the word "submitted" in section 3050, subdivision (c) and the words "a protest presented" in subdivision (d). These words show that the enumerated duties of the Board include the

consideration of certain claims *brought to* the Board. That is a far cry from the idea that the Board must adjudicate *all* claims between dealers and manufacturers, even if the claimants, usually new car dealers, would rather go to court.

Additionally, a plenary construction of the Board's powers is at odds with the language in subdivision (a) of section 3050, which instructs the Board to adopt rules and regulations "governing such matters as are specifically committed to its jurisdiction." That little word "specifically" suggests that the Board's jurisdiction is, as the *Ri-Joyce* court divined, "limited."

Finally, there is the small difference between section 3050, subdivision (c)'s "[c]onsider any matter . . . submitted" and subdivision (d)'s "[h]ear and consider . . . a protest presented." The latter phraseology suggests a process of *particular adjudication*, while the former naturally encompasses the *rule making* function of the Board independent of any particular dispute.

There is an old joke about a military parade at the end of World War II, where a housewife, Mrs. Murphy, points proudly to her son and tells her neighbor, "look, he's the only soldier in the whole parade who is keeping the right step." Well, this a case when Mrs. Murphy is right. Only *Ri-Joyce* is fully consonant with the Supreme Court's teaching in *Rojo* and *McHugh*. The Board does not possess exclusive jurisdiction over a case *merely* because the litigants are a new car dealer and a manufacturer.

Relying on a fragment of a legislative report quoted in *Yamaha II*, 195 Cal.App.3d at page 657, Honda argues that the Legislature intended to " 'replace the courts with the . . . board as a preliminary forum of franchise or other disputes between dealers and manufactures and distributors.' "[7] Honda thereby argues the Legislature did indeed intend to replace new car dealers' common law claims with an administrative process through the Board.

Not so. First, the phrase "or other disputes" mentioned in the report quoted in *Yamaha II* does not necessarily entail *every* dispute—it just as naturally may be read to refer to the enumerated classes of disputes listed in the Vehicle Code which the Board certainly has authority to hear. Second, and more fundamentally, there is a presumption a statute does not by implication repeal the common law (e.g., *Rojo* v. *Kliger, supra*, 52 Cal.3d at p. 75) and there is nothing in the grant of powers to the Board that expressly confers upon it jurisdiction over common law disputes otherwise not enumerated within the list of disputes it *is* empowered to hear. To use *Rojo*'s

---

[7] *Yamaha II* in turn relied on a bill report from the Department of Finance from the 1973-1974 legislative session. (See *Yamaha II, supra*, 195 Cal.App.3d at pp. 657-658.)

phrase, had the Legislature intended to abrogate a dealer's common law remedies for every dispute with a manufacturer, "it plainly knew how to do so." (*Ibid.*)

We must, accordingly, respectfully disagree with *Ray Fladeboe* to the degree that it based its decision on the possibility that "artful pleading" might circumvent the jurisdiction of the Board. The Board is not the exclusive forum for disputes between dealers and manufacturers. The Legislature established the Board to prevent "undue control" of new car dealers by manufacturers (see Stats. 1973, ch. 996, § 1, p. 1964), not to give manufacturers an extra line of defense from lawsuits by dealers. Indeed, given *Rojo*, we must respectfully part company from the Court of Appeal decisions which have held that the doctrine of exhaustion necessarily precludes new car or motorcycle dealers from suing a manufacturer for common law claims until they first present those claims to the Board. There simply is insufficient indicia from the Legislature that it intended the Board to occupy the field exclusively.

## 2. *Primary Jurisdiction*

There is a flip side to the exhaustion doctrine which we have just rejected—the doctrine of primary jurisdiction. (See *State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1111 [53 Cal.Rptr.2d 229] ["The judicially created doctrine of 'primary jurisdiction' is the flip side of the rule requiring the exhaustion of administrative remedies."].) Just because a party is not absolutely required to bring a claim to an administrative agency before suing in court does not mean the claim *should* still not be heard by that agency before a court gets it. Some common law claims, by their nature, benefit from administrative expertise even though there is no steadfast requirement that the claim be first adjudicated by an administrative agency.

In *Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th 377, the California Supreme Court for the first time delineated in great detail the genesis and development of the primary jurisdiction doctrine, and explained the difference between it and exhaustion of remedies. *Farmers* involved a lawsuit brought under the Unfair Practices Act by the state—without first going through the Insurance Commissioner—against an insurance company for refusing to offer good driver discounts required by Proposition 103. (See *Farmers, supra,* 2 Cal.4th at p. 381.) The unfair practices claim was "originally cognizable in the courts," so the usual policy considerations in favor of administrative autonomy were inapplicable. (See *id.* at p. 391.) But that did not end the analysis. Exhaustion may not have been applicable, but primary jurisdiction was. (*Ibid.*)

Specifically, the allegations in the state's complaint demonstrated a paramount need for specialized agency factfinding expertise. (*Farmers Ins. Exchange* v. *Superior Court*, *supra*, 2 Cal.4th at p. 398, citing *Rojo* v. *Kliger*, *supra*, 52 Cal.3d at p. 88.) In particular, the unfair practices claim by the state required the resolution of a series of questions revolving around specific Insurance Code sections, which both mandated the Insurance Commissioner's expertise and posed a risk of inconsistent adjudications if a court had to adjudicate those questions without "benefit of the views" of the commissioner. (*Farmers*, *supra*, 2 Cal.4th at p. 398.) A stay of proceedings, with the trial court directed to retain the matter in its docket pending the agency adjudication (and "closely monitor" that adjudication to ensure against unreasonable delay), was the appropriate disposition of the case. (*Id.* at p. 401.)

### 3. *Application to Allocation Claims*

Application of the primary jurisdiction doctrine "is a matter within the discretion of the court as to whether a case should be stayed pending administrative action on the issue." (*State Farm Fire and Casualty* v. *Superior Court*, *supra*, 45 Cal.App.4th 1093, 1112) In the case before us, the trial court's stay of the action was not the result of an exercise of discretion under the primary jurisdiction doctrine, but of the belief that it had no choice under the exhaustion of remedies doctrine. All else being equal, that fact would compel us to grant the writ, so the trial court could have the opportunity to exercise its discretion. The tough question is, is there anything to be gained by so granting the writ in this case? After all, isn't it obvious that the trial court will want the expertise of the Board? If the Board has any special expertise it is in the allocation of vehicles by manufacturers to dealers, and allocation (or, rather, misallocation) is part and parcel of the Millers' claim.

On balance, however, the question is not so clear-cut that we should, in effect, substitute our discretion for the trial judge's. While the Board's expertise as to vehicle allocation would no doubt be extremely helpful, we do not forget that the Millers are claiming that allocation patterns were distorted because of widespread bribery. Moreover, the Millers' claims were pled by way of cross-complaint, so we cannot say that calendering and scheduling considerations (which might favor passing up the opportunity to have the Board look at the matter first) are of no import at all. Most dispositive, though, is the jury trial point which prompted our discussion to begin with. Having concluded the doctrine of exhaustion is *not* applicable, whatever benefits *the court* might acquire from preliminary adjudication by the Board concerning allocation patterns must be balanced against the burden to the plaintiffs from the delay and their right to have questions of

fact—particularly bearing on the bribery alleged—determined by a jury, not the Board. If one has a right to a trial by jury, one has a right to a trial by jury—particularly in a dispute over whether bribery ever actually occurred.[8] The trial court is in the best position to consider how much is to be gained by delaying that right.

Accordingly, let a peremptory writ issue commanding the trial court to vacate its order staying the Millers' cross-complaint and to consider, under the doctrine of primary jurisdiction, whether to stay proceedings on the cross-complaint pending adjudication by the New Motor Vehicle Board.

Crosby, J., and Rylaarsdam, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied February 19, 1997.

---

[8]Because we conclude that the Millers are entitled to have their day in court at least eventually, and the doctrine of exhaustion of remedies does not apply, we need not address the thorny question of whether the Board is empowered to give them an adequate remedy. We do, however, make one observation: The doctrine of exhaustion of administrative remedy necessarily entails the idea that there *is* an administrative remedy. The absence of any provision for damages in the statutory scheme governing the Board is thus itself some confirmation of our conclusion that the Legislature never intended the Board to completely occupy the field of disputes between dealers and manufacturers.