Filed 5/28/21

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| KENNETH S. BRADLEY et al., | B308040 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 20STCV24147) |
| v. | |
| CVS PHARMACY, INC., et al., | |
| Defendants and Respondents. | |


APPEAL from an order of the Superior Court of Los Angeles County. Mark V. Mooney, Judge. Affirmed with directions.

Fleming Law Firm and J. Patrick Fleming, Jr. for Plaintiffs and Appellants.

Spertus, Landes & Umhofer, James W. Spertus and Elizabeth A. Mitchell for Defendants and Respondents.

—————————————

Kenneth S. Bradley and his medical corporation, Southern California Pain Consultants, Inc. (collectively, Bradley) appeal from an order denying Bradley's motion for a preliminary injunction against respondents CVS Pharmacy, Inc., Longs Drug Stores California LLC (Longs), Garfield Beach CVS, LLC (Garfield), and Autumn Miller (collectively, CVS).[1] Bradley is a doctor who specializes in pain management. In June 2020, CVS stopped filling Bradley's prescriptions for controlled substances for his patients, citing concerns about his prescribing patterns. Bradley sued CVS and then sought a preliminary injunction to require CVS to fill his prescriptions.

The trial court denied the injunction on several grounds, including the conclusion that Bradley should have first sought relief from the California State Board of Pharmacy (Board). The Board is charged with the responsibility of enforcing state rules governing pharmaceutical licensees. (See Bus. & Prof. Code, § 4001, subd. (a).)[2]

The trial court based this conclusion on the doctrine of exhaustion of administrative remedies. We affirm the trial court's ruling on an alternative but closely related ground. The trial court's decision to deny the preliminary injunction and to stay the action pending review by the Board is supported by the doctrine of primary jurisdiction.

---

[1] Longs and Garfield are subsidiaries of CVS Pharmacy, Inc. Miller is a pharmacist with CVS who allegedly was involved in the decision by CVS to stop honoring Bradley's prescriptions that is the subject of Bradley's complaint.

[2] Subsequent undesignated statutory references are to the Business and Professions Code.

The Board has primary jurisdiction to consider the particular statutory obligations underlying Bradley's injunction motion. Bradley's claim that CVS has an obligation to fill his prescriptions rests primarily on Business and Professions Code section 733, which provides in part that a "licentiate shall not obstruct a patient in obtaining a prescription drug or device that has been legally prescribed or ordered for that patient." (*Id.*, § 733, subd. (a).) The Board is empowered to issue fines and "orders of abatement" for violations of that section. (*Id.*, § 4314, subd. (a).) The Board is also charged with the responsibility to remedy unprofessional conduct by licensees. (*Id.*, § 4301.) Such conduct includes the "clearly excessive furnishing of controlled substances" in violation of a pharmacist's responsibility to ensure that prescriptions for controlled substances are issued only for a legitimate medical purpose. (Bus. & Prof. Code, § 4301, subd. (d); Health & Saf. Code, § 11153, subd. (a).)

Thus, the trial court correctly recognized that an order requiring CVS to honor particular prescriptions would involve judgments concerning the statutory obligations of pharmacists that the Board is both expected and equipped to resolve. The Board is also empowered to issue an abatement order, if warranted, that would perform the equivalent role of an injunction in providing the relief that Bradley seeks. The trial court therefore reasonably ruled that Bradley should first seek relief from the Board before pursuing his claims in court.

## BACKGROUND

### 1. Bradley's Practice

Bradley is a licensed physician with 26 years of experience in his own practice and as an officer in the Army Reserve. He specializes in the "treatment and management of pain." His

3

patients include persons who experience chronic pain from conditions such as cancer, surgeries, and degenerative disk disease.

Bradley's practice primarily serves patients from health maintenance organizations (HMO's). He has referral relationships with about 30 HMO's in the Los Angeles area. Most of Bradley's patients are minorities who receive medical insurance through Medicare or Medi-Cal.

Bradley's pain management treatment often includes prescriptions for controlled substances, including opiates such as oxycodone, hydrocodone, and morphine. Bradley is licensed to prescribe these medications. According to Bradley, most of his patients fill their prescriptions at their local CVS pharmacies.

## 2. CVS's Decision Not to Fill Bradley's Controlled Substance Prescriptions

In 2018 and 2019 CVS contacted Bradley to ask him about increases in his prescriptions for Norco (a hydrocodone). Bradley explained to CVS that Norco is a low potency opiate and therefore has a "lower potential for overdose while still controlling pain." CVS took no action after these communications.

In April 2020, Miller contacted Bradley and introduced herself as a pharmacist at a CVS pharmacy in Carson. According to Bradley, Miller told him that she would not fill Bradley's prescriptions unless he provided plans for his patients to "taper off their opiate medications." Bradley explained his office procedures and his practice of using "great caution when prescribing opiates." However, Bradley "refused to comply with Ms. Miller's demand that I create plans to reduce and ultimately eliminate the dosage levels of opiate medications that I had concluded are necessary for my patients." After that

4

conversation, Miller adopted a policy of refusing to fill Bradley's controlled substance prescriptions in the pharmacy where she worked.

In May 2020, a CVS senior manager wrote Bradley a letter concerning CVS's review of Bradley's "prescription dispensing records." The letter stated that, "[b]ased on our data we have identified that your controlled substance prescribing may be outside the normal range in comparison with other prescribers in your specialty and geographic region." The letter requested an opportunity to speak with Bradley to "obtain a better understanding" of Bradley's controlled substance prescriptions.

After receiving the letter, Bradley spoke with CVS representatives. The representatives had questions about: (1) Bradley's prescriptions for Norco for a majority of his patients; (2) Bradley's prescriptions for Valium; and (3) a spike in Bradley's controlled substance prescriptions during March and April of 2020. Bradley explained that his prescription options were limited by HMO requirements; Norco is a low potency opiate; and Valium is a low potency drug that is helpful for sleep. He also explained that his prescriptions spiked for several months as a result of the Los Angeles Covid-19 stay at home order. Because he was the only person in his practice who was certified to "conduct e-prescribing," he had "temporarily carried the prescription load" for the other two prescribers in his office while the office was closed.

On June 17, 2020, CVS wrote to Bradley informing him that, effective June 25, 2020, "CVS/pharmacy stores will no longer be able to fill prescriptions that you write for controlled substances." The letter stated that, "[d]espite our attempts to

5

resolve the concerns with your controlled substance prescribing patterns these concerns persist."

According to CVS, it took this step based upon its "prescription monitoring program." CVS created this program in 2012 and has implemented it nationwide. The program "uses algorithms to gather aggregate data on physician prescribing practices to identify physicians who demonstrate extreme patterns of prescribing certain highly regulated drugs." Those physicians "who are flagged for high-risk prescribing activity" are then interviewed and investigated.

CVS claimed that Bradley had been flagged by its program "multiple times" since 2015 and had also been the subject of complaints by individual CVS pharmacists. CVS explained that Bradley was the top prescriber for hydrocodone "[a]mong the ten CVS locations that most frequently serve Bradley's patients." CVS also cited the fact that, between March and May of 2020, "Bradley's prescriptions increased from approximately 10,000 tabs of hydrocodone per month to almost 50,000 tabs."

### 3.    Proceedings in the Trial Court

Bradley filed his initial complaint on June 25, 2020, followed by an amended complaint (Complaint) on July 8, 2020. Bradley's Complaint alleges claims for (1) declaratory relief, (2) unfair competition under Business and Professions Code section 17200, (3) tortious interference with contract and prospective economic advantage, and (4) civil rights violations under the Unruh Civil Rights Act (Civ. Code, § 51.)[3]

---

[3] Bradley's claims for tortious interference are based on the theory that CVS's refusal to honor his prescriptions damaged his

6

After the trial court denied a request for a temporary restraining order, Bradley filed his motion for a preliminary injunction on July 20, 2020. CVS opposed the injunction and demurred to Bradley's Complaint. Both CVS's opposition and its demurrer argued that the trial court should defer to the Board under the doctrines of exhaustion of administrative remedies, equitable abstention, and primary jurisdiction.

Following a hearing on September 15, 2020, the trial court denied Bradley's motion for a preliminary injunction and sustained CVS's demurrer with leave to amend. The court concluded that Bradley's claims raised issues that "should be dealt with by the Pharmacy Board." The court explained that, "[w]hether we talk about it in terms of the demurrer or the injunction, there is an administrative body that is set up to deal with this."

The trial court also found that Bradley had failed to show that he would suffer irreparable injury in the absence of an injunction. The court concluded that Bradley's alleged loss of business was compensable through damages, and that, "[i]n terms of the patients, there are other pharmacies they can go to, other doctors they can go to, if that's the concern."

After Bradley amended his Complaint, CVS again demurred. The trial court again sustained CVS's demurrer and ordered the action stayed pending consideration by the Board.

---

business relationships with HMO's. His Unruh Act claim is based on the theory that CVS's conduct was motivated by an intent to discriminate against Bradley's low-income minority patients in favor of wealthier customers who have more lucrative insurance plans.

7

**DISCUSSION**

**1.      Legal Principles and Standard of Review**

There are several different but closely related doctrines that either require or permit judicial deference to administrative agencies.  One such doctrine, typically described as the exhaustion doctrine, requires parties to exhaust their remedies in an administrative tribunal before seeking relief in court.  In *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917 (*Jonathan Neil*), our Supreme Court explained that there are "three distinct strands" of this doctrine that are each "justified by somewhat different rationales."  (*Id.* at p. 930.)

First, an aggrieved party is generally required to seek administrative relief when "a statute and lawful regulations pursuant thereto establish a quasi-judicial administrative tribunal to adjudicate statutory remedies."  (*Jonathan Neil, supra,* 33 Cal.4th at p. 930.)  In such a situation, the administrative tribunal is charged with the responsibility to resolve the dispute, and " ' "the courts may act only to *review* the final administrative determination." ' "  (*Ibid.*)

Second, the exhaustion doctrine generally applies "when a private or public organization has provided an internal remedy." (*Jonathan Neil, supra,* 33 Cal.4th at p. 930.)  This strand of the doctrine is based on a judicial policy " ' "that the association itself should in the first instance pass on the merits of an individual's application rather than shift this burden to the courts." ' "  (*Ibid.*, quoting *Rojo v. Kliger* (1990) 52 Cal.3d 65, 86 (*Rojo*).)

Third, courts have required exhaustion of administrative remedies in " 'a variety of public contexts' " where the administrative agency " 'possesses a specialized and specific body of expertise in a field that particularly equips it to handle the

8

subject matter of the dispute.' " (*Jonathan Neil, supra,* 33 Cal.4th at p. 931, quoting *Rojo, supra,* 52 Cal.3d at p. 87.) As an example of a case in this category, our Supreme Court cited *Karlin v. Zalta* (1984) 154 Cal.App.3d 953 (*Karlin*). That case involved allegations of excessive medical malpractice insurance rates. The plaintiffs' claims raised factual issues concerning the heavily regulated area of medical malpractice insurance ratemaking that made the expertise of the Insurance Commissioner indispensable. (*Jonathan Neil*, at p. 931.)

The primary jurisdiction doctrine also permits judicial deference to administrative expertise. Like the exhaustion doctrine, the doctrine of primary jurisdiction promotes " ' "comity between courts and agencies." ' " (*Jonathan Neil, supra,* 33 Cal.4th at p. 931, quoting *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 (*Farmers*).) The major difference between the two doctrines is whether courts are *required* to defer to an administrative agency. The exhaustion doctrine applies " ' "*where a claim is cognizable in the first instance by an administrative agency alone*," ' " and the primary jurisdiction doctrine applies " ' "*where a claim is originally cognizable in the courts*" ' " but involves issues " ' "which, under a regulatory scheme, have been placed within the special competence of an administrative body." ' " (*Jonathan Neil*, at p. 931, quoting *Farmers*, at p. 390.) In the latter circumstance, the " ' "judicial process is suspended pending referral of such issues to the administrative body for its views." ' " (*Ibid.*)[4]

---

[4] This difference does not necessarily help in deciding whether the exhaustion doctrine or the primary jurisdiction

As our Supreme Court has explained, the policy reasons behind the doctrines of exhaustion and primary jurisdiction are " 'similar and overlapping.' " (*Jonathan Neil, supra,* 33 Cal.4th at p. 932, quoting *Farmers, supra,* 2 Cal.4th at pp. 391–392.) Both focus on " 'judicial efficiency.' " (*Ibid.*) They differ somewhat with respect to the reasons for deference to the administrative agency. The exhaustion doctrine respects the autonomy of administrative agencies to reach a final decision without judicial interference, while the primary jurisdiction doctrine allows courts to " 'take advantage of administrative expertise.' " (*Ibid.*)

The doctrines also differ in the procedures they employ. Unless an agency is empowered to decide all the issues in a pending lawsuit, the appropriate procedure for a court that applies the primary jurisdiction doctrine is to stay the lawsuit pending a decision by the administrative agency. (*Jonathan Neil, supra,* 33 Cal.4th at p. 935.) In contrast, where exhaustion of administrative remedies is required, courts may dismiss prematurely filed lawsuits in favor of an administrative remedy. (See *Tejon Real Estate, LLC v. City of Los Angeles* (2014) 223 Cal.App.4th 149, 156 ["A demurrer may properly be sustained based on the failure to adequately plead exhaustion of administrative remedies"].)

---

doctrine applies in a particular case. As discussed above, the third strand of exhaustion cases is based upon the need for deference to the particular expertise of an agency in a heavily regulated area. That same factor also underlies the primary jurisdiction doctrine. Whether such deference is required or merely discretionary seems to be the result of applying one doctrine or the other rather than a criterion to determine which doctrine should apply.

10

A third related doctrine permits courts to "abstain from adjudicating a suit that seeks equitable remedies if 'granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency.' " (*Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237, 1258 (*Blue Cross*), quoting *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1298.)  For example, in *Alvarado* the court concluded that the task of calculating "on a classwide basis" whether nursing facilities were in compliance with complex regulations was a "task better accomplished by an administrative agency than by trial courts." (*Alvarado*, at p. 1306.)

A decision whether to defer to an administrative agency under either the primary jurisdiction doctrine or equitable abstention doctrine is reviewed for abuse of discretion.  (*Blue Cross, supra,* 180 Cal.App.4th at pp. 1257, 1260.)

**2.    The Trial Court Did Not Abuse Its Discretion in Ruling that Bradley Should First Seek Relief from the Board**

**a.    *The primary jurisdiction doctrine applies***

Under the criteria discussed above, the doctrine of exhaustion of administrative remedies was not the appropriate ground to deny Bradley's injunction motion.  The statutory scheme here does not fit within any of the three categories of cases our Supreme Court identified in *Jonathan Neil* that *require* administrative review prior to recourse to the courts.

First, the statutory scheme does not support the conclusion that the Board is the *exclusive* forum to resolve disputes between private parties of the type involved here.  The Board is not a

"quasi-judicial administrative tribunal" that is tasked with the responsibility "to adjudicate statutory remedies." (*Jonathan Neil, supra,* 33 Cal.4th at p. 930.) It has supervisory and enforcement powers over pharmacists and pharmaceutical licensees. But nothing in the governing statutes tasks it with the responsibility to adjudicate individual claims for relief against pharmacists.

The Board has the authority to "issue citations containing fines and orders of abatement for any violation of [Business and Professions Code] Section 733, [or] for any violation of this chapter[, sections 4000–4427.8]."[5] (Bus. & Prof. Code, § 4314, subd. (a).) The Board is also charged with the authority and the responsibility to "take action against any holder of a license who is guilty of unprofessional conduct." (Bus. & Prof. Code, § 4301.) Such unprofessional conduct includes the "clearly excessive furnishing of controlled substances in violation of subdivision (a) of Section 11153 of the Health and Safety Code."[6] (Bus. & Prof. Code, subd. (d).)

These statutes give the Board the responsibility to decide whether a pharmaceutical licensee has violated a duty to fill prescriptions under Business and Professions Code section 733. The statutes also give the Board the task of determining whether pharmaceutical licensees have failed to meet their "corresponding responsibility" to ensure that prescriptions are for a "legitimate

---

[5] That chapter is described as the "Pharmacy Law." (§ 4000.)

[6] That subdivision provides in part that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." (Health and Saf. Code, § 11153, subd. (a).)

medical purpose." (Health and Saf. Code, § 11153, subd. (a); Bus. & Prof. Code, § 733.)

Thus, the statutory scheme empowers the Board to *decide* key issues raised by Bradley's injunction motion, including the scope of CVS's statutory obligation to fill Bradley's prescriptions and the extent of CVS's corresponding responsibility to prevent prescription abuse. However, that power arises from the Board's enforcement responsibility, not from any responsibility to adjudicate particular civil disputes.

Second, there is no "private or public organization" here that "has provided an internal remedy." (*Jonathan Neil, supra,* 33 Cal.4th at p. 930.) The Board is not an organization with an internal dispute resolution procedure, but an oversight and enforcement entity.

The third category that the court identified in *Jonathan Neil* presents a closer question. The majority of the Board is composed of pharmacists drawn from different practice settings. (§ 4001, subds. (b) & (c).) The Board therefore " 'possesses a specialized and specific body of expertise in a field that particularly equips it to handle the subject matter of the dispute.' " (*Jonathan Neil, supra,* 33 Cal.4th at p. 931.) However, such administrative expertise is also a factor supporting a finding of primary jurisdiction. (*Id.* at p. 934.)

The statutory scheme here does not suggest that the Board has authority over a " ' "pervasive and self-contained system of administrative procedure" ' " that makes its expertise " ' "indispensable." ' " (*Jonathan Neil, supra,* 33 Cal.4th at p. 931, quoting *Karlin, supra,* 154 Cal.App.3d at p. 983.) The Board has expertise in the subject matter of Bradley's claims, including the scope of pharmacists' responsibilities and the identification of

13

factors indicating prescription abuse.  But the governing statutes do not establish a separate universe of administrative rules and procedures that only the Board has the expertise to interpret.  The exhaustion doctrine therefore does not apply.

This conclusion is supported by the holding in *Jonathan Neil.*  That case involved a claim that premiums the defendants charged for "assigned risk insurance" for a trucking company were too high.  (*Jonathan Neil, supra,* 33 Cal.4th at p. 923.)  The premiums were governed by rules promulgated by the Department of Insurance.  (*Id.* at p. 925.)  However, the common law claims involved in the lawsuit were "originally cognizable in court.  The Insurance Commissioner has no authority to decide these common law claims, but can only make a determination regarding some of the issues in the case.  Nor can we discern in Insurance Code section 11620 et seq. an absolute statutory bar to prosecuting such claims absent a prior administrative determination."  (*Id.* at p. 933.)  The exhaustion doctrine therefore did not apply.  (*Id.* at p. 934.)

Similarly, here, Bradley's statutory and common law claims were originally cognizable in court.  The Board cannot finally adjudicate those claims, but can only determine important issues that are relevant to them.  And the governing statutes do not suggest that litigants are absolutely barred from seeking relief in court before raising such issues before the Board.

However, the decision in *Jonathan Neil* also supports the conclusion that the primary jurisdiction doctrine *does* apply here.  The court in *Jonathan Neil* decided that, although the exhaustion doctrine was not applicable, "the case for invoking the primary jurisdiction of the Insurance Commissioner is compelling."  (*Jonathan Neil, supra,* 33 Cal.4th at p. 934.)  The court observed

14

that the issues raised in the trucking company's cross-complaint "directly implicate the regulatory authority and expertise of the Insurance Commissioner." (*Ibid*.) The court also explained that the Department of Insurance's interpretation and application of the governing regulations in the first instance was "necessary to secure regulatory uniformity informed by its expertise and extensive experience with this area of regulation." (*Ibid*.) The same factors apply here.

First, as discussed, Bradley's injunction motion raises issues that are within the particular expertise of the Board. Bradley's claims depend upon the theory that CVS had a legal obligation to fill his prescriptions.[7] The critical allegation in Bradley's complaint is that, "[a]s a matter of California law, CVS and its pharmacists are required to honor any prescription issued by a physician such as Dr. Bradley, subject only to a corresponding duty to confirm that the prescription has been issued for legitimate medical purposes relating to the patient's

---

[7] A possible exception is Bradley's cause of action for violation of the Unruh Act. As mentioned, Bradley's theory under that claim is that "a substantial motivating reason for [CVS's] conduct is the race, color, disability or medical condition of [Bradley's] patients, who for the most part are minorities suffering from medical conditions causing chronic pain requiring opiate medications." A refusal to deal on the ground of race or other protected characteristic may be unlawful. (See 5 Witkin, Summary of Cal. Law (11th ed. 2020) Torts, § 877(1)(a) (hereafter Witkin).) However, the Board's expertise is nevertheless relevant. Whether CVS had a legal justification under the Pharmacy Law to refuse to fill Bradley's prescriptions could bear upon the question whether CVS's stated reason for its refusal was pretextual.

15

care." Bradley's claims depend upon such a legal obligation to overcome the principle that, "[a]bsent a legal provision to the contrary, a private party generally may choose to do or not to do business with whomever it pleases." (*Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 254; see 5 Witkin, *supra,* Torts, § 877(1).) The theory that CVS was legally obligated to fill Bradley's prescriptions underlies his request for declaratory relief,[8] his claim that CVS's conduct was unfair or unlawful under section 17200,[9] and his causes of action for tortious interference with contract and prospective economic advantage.[10]

Bradley's claim that CVS had a legal obligation to fill his prescriptions raises questions that the Board has the expertise to answer. Bradley relies upon Business and Professions Code section 733 as the source of this obligation. As mentioned, that

---

[8] Bradley seeks a declaration that "under California law [CVS is] not allowed to impose a blanket ban on all controlled substance prescriptions issued by Dr. Bradley to his patients."

[9] Bradley claims that CVS engaged in unlawful conduct by "blacklisting . . . all of Dr. Bradley's controlled substance prescriptions without considering the legitimate medical purpose for which the prescriptions have been issued."

[10] Unless CVS was legally obligated to fill Bradley's controlled substance prescriptions, its refusal to do so may have been privileged as an exercise of its right to choose its business customers or justified under its statutory obligations as a pharmaceutical licensee. (See *Environmental Planning & Information Council v. Superior Court* (1984) 36 Cal.3d 188, 193–194 (interference with contract or with prospective economic advantage is not actionable if privileged); 5 Witkin, *supra,* Torts, § 877(1).)

16

statute provides that a "licentiate shall not obstruct a patient in obtaining a prescription drug or device that has been legally prescribed." (*Id.*, § 733, subd. (a).) A licentiate has no duty to fill a prescription if, "[b]ased *solely on the licentiate's professional training and judgment,* dispensing pursuant to the order or the prescription is contrary to law." (*Id.*, § 733, subd. (b)(1), italics added.) By virtue of its composition and its role, the Board has a unique ability to evaluate whether a decision not to fill prescriptions was justified by a pharmaceutical licensee's "professional training and judgment." The Board also has the expertise to evaluate the scope of CVS's *obligation* not to fill particular prescriptions under the corresponding responsibility rule. (See Health and Saf. Code, § 11153, subd. (a).)

The Board also has the background to evaluate the specific facts that are relevant to these issues. For example, Bradley claimed in his declaration supporting his injunction motion that the dosages he prescribes for his patients "are not excessive." He explained that, "[w]ith a few exceptions for particularly difficult conditions, I prescribe hydrocodone to my patients. Hydrocodone is the lowest potency pure mu receptor opiate agonist available, and I almost always prescribe daily dosages less than 50 daily morphine milligram equivalents ("MME"), well below the 90 MME guideline set by CVS in its 2018 CVS Pharmacy Reference Guide."[11] The Board is better equipped than the courts to evaluate how such technical claims affect CVS's statutory "corresponding responsibility."

_____

[11] Bradley explained that " 'mu' is a pain receptor for opiates; 'agonist' describes the hydrocodone molecule which fits onto the receptor."

17

Moreover, as the trial court observed, the issue of CVS's statutory obligations arises in the context of a national opioid problem. The trial court explained that "[o]pioids is a very serious issue that I don't think the court has nearly enough information to make the call on." The trial court reasonably concluded that the Board has more experience in evaluating a pharmaceutical licensee's responsibilities in this context.

Second, the wide scope both of the opioid problem and of CVS's program to monitor prescriptions supports the need for "regulatory uniformity." (See *Jonathan Neil, supra,* 33 Cal.4th at p. 934.) CVS claims that its computerized prescription monitoring program has "been implemented nationwide." This widely implemented program thus is likely to affect prescribing doctors in addition to Bradley. The Board is well positioned to adopt a uniform approach to determining whether such programs—and CVS's implementation of its own program here—are consistent with pharmacists' professional obligations.

### b. *Bradley does not identify any impediment to applying the doctrine of primary jurisdiction here*

Bradley makes a number of arguments as to why Board review is not appropriate. None are persuasive.

Bradley argues that the Board does not have jurisdiction over CVS, which is not a California licensee. But Longs and Garfield—CVS subsidiaries that are both named defendants in this action—do hold California pharmacy licenses. CVS claimed below that those entities did not "directly operate" the CVS monitoring program and did not "take the challenged action against Bradley." However, regardless of which entity made the decision not to fill Bradley's prescriptions, Longs and Garfield

18

were responsible for complying with California law in implementing that decision. Bradley does not provide any reason to conclude that those entities would be immune from a Board enforcement remedy simply because they were following orders from their parent company.

Bradley also claims that the Board has authority only over violations of section 733 by *individuals* and may not take any action against corporate violators. Bradley bases this claim on the Legislature's use of the term "his or her" in some portions of section 733. (See, e.g., § 733, subd. (a) ["A violation of this section constitutes unprofessional conduct by the licentiate and shall subject the licentiate to disciplinary or administrative action by *his or her* licensing agency"], italics added.) We reject the argument, which cannot be reconciled with the express scope of section 733 and of the Board's enforcement powers.

Section 733 specifically applies to any "licentiate." (§ 733, subds. (a) & (b).) The term "licentiate" is equivalent to "licensee," and applies to any "*person* authorized by a license, certificate, registration, or other means to engage in a business or profession regulated by [the Business and Professions Code]." (§ 23.8, italics added.) The Pharmacy Law in turn defines "person" broadly to include a "firm, association, partnership, corporation, limited liability company, state governmental agency, trust, or political subdivision." (§ 4035.)

The statute describing the Board's enforcement authority confirms that the Board may take remedial action against licensed entities as well as individuals. Section 4314, subdivision (a) states that the Board may issue citations, including fines and orders of abatement, "for any violation of Section 733" and other relevant statutes. Subsequent subdivisions explain that the

19

Board may issue such citations to a "person or entity."  (§ 4314, subds. (b) & (c).)  In particular, an order of abatement may "require the *person or entity* to whom the citation is issued to demonstrate how future compliance with the Pharmacy Law, and the regulations adopted pursuant thereto, will be accomplished."  (§ 4314, subd. (c), italics added.)

Finally, section 4301 provides that the Board "shall take action against *any holder of a license* who is guilty of unprofessional conduct."  (§ 4301, italics added.)  "Any" holder of a license necessarily includes licensed entities.  And, as mentioned, section 733 expressly provides that a violation of that statute constitutes unprofessional conduct.  (§ 733, subd. (a).)

In light of these provisions, the Legislature's occasional use of the term "his or her" rather than "his, her or its" in section 733 cannot reasonably be read as a limitation on the scope of the Board's authority to take remedial action against any licensee, including a corporate licensee, for violations of the Pharmacy Law.

Bradley also claims that the primary jurisdiction doctrine does not apply here because resolution of the legal and factual issues in this case "does not require any specialized knowledge or specific body of expertise."  He argues that his claims raise only "matters that are routinely handled by California courts."

However, the issue is not whether the courts are *capable* of adjudicating Bradley's claims, but whether those claims require " ' "the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." ' "  (*Jonathan Neil, supra,* 33 Cal.4th at

20

p. 931.)  For the reasons discussed above, we conclude that Bradley's claims fall in this category.[12]

Finally, Bradley argues that any benefit from the Board's review of the issues would be outweighed by the delay that would result.  In considering whether to stay an action pending administrative review, a court should balance the benefits that the court would obtain from such review against the detriment from delay and the potential prejudice to the plaintiff's right to a jury trial.  (*Miller v. Superior Court* (1996) 50 Cal.App.4th 1665, 1677–1678 (*Miller*).)

Here, the trial court considered the harm from delay in rejecting Bradley's claim that a preliminary injunction was necessary to prevent irreparable harm.  The court recognized that CVS's conduct might have had an effect on Bradley's practice but concluded that this damage was no different from "every case where a plaintiff is suffering damages.  They want to resolve it as soon [as] possible to get their reimbursement, get their damages.  That doesn't create irreparable harm."

Bradley presented evidence that he had lost 20 to 30 percent of his patients and a large number of referrals from

---

[12] Bradley's argument that the Board cannot award damages or finally adjudicate all of Bradley's claims is not a basis to reject a decision to defer to the Board in the first instance under the primary jurisdiction doctrine.  As discussed, under the primary jurisdiction doctrine, administrative review does not preclude or replace judicial relief.  Rather, " ' "the judicial process is *suspended* pending referral." ' "  (*Jonathan Neil, supra,* 33 Cal.4th at pp. 931–932, italics added.)  Any remaining issues in this lawsuit can be adjudicated in court after the Board has had an opportunity to review the questions that fall within its jurisdiction.

21

HMO's. If he is successful in proving that tortious conduct by CVS caused such losses, he might recover significant damages. But the trial court reasonably concluded that such monetary losses did not amount to irreparable harm justifying an immediate order.

Moreover, Bradley shares some responsibility for the delay in adjudicating his claims. Rather than initiating a complaint with the Board, Bradley has elected to pursue only his judicial remedies. But for that choice, the Board might have already decided whether to issue an abatement order or made some other final ruling that cleared the way for Bradley's tort claims to be adjudicated.

Finally, referral to the Board will not have any effect on Bradley's right to a jury trial. For all the reasons discussed above, a ruling from the Board will provide a benefit to the court in ruling on issues that are reserved for its decision.[13] If jury issues remain, a jury trial may proceed following Board review.

---

[13] For example, a decision by the Board could assist the court in resolving Bradley's requests for injunctive and equitable relief, including his unfair competition claim. (See *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 333, 334 [claims under section 17200 are equitable in nature, and "there is no right to a jury trial in such actions under California law either as a statutory or constitutional matter"].) Such a decision could also assist the court in deciding legal issues concerning the scope of pharmaceutical licensees' rights and obligations under section 733 for purposes of fashioning declaratory relief and crafting jury instructions.

### c. *The trial court properly exercised its discretion in denying the preliminary injunction*

Although the primary jurisdiction doctrine supports the trial court's ruling, the question remains whether we should affirm on that ground. As mentioned, the doctrine is discretionary. When a trial court has not considered the issue, and therefore has not exercised its discretion in deciding whether the primary jurisdiction doctrine applies, it may be appropriate for a reviewing court to remand to permit such consideration rather than first deciding the issue as a matter of law. (See *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 211, fn. 14 [holding that the exhaustion doctrine did not apply, and that, because the primary jurisdiction doctrine had not been raised below, the "trial court in the first instance should decide whether this case should be stayed" under that doctrine]; *Miller, supra,* 50 Cal.App.4th at p. 1677 [remanding for the trial court to consider the primary jurisdiction issue where "the trial court's stay of the action was not the result of an exercise of discretion under the primary jurisdiction doctrine, but of the belief that it had no choice under the exhaustion of remedies doctrine"].)

The trial court here did not explain its reasoning in a written ruling, so we must discern the basis for its decision from the hearing transcripts. At the hearing on the preliminary injunction, the trial court identified the exhaustion requirement as the basis for its ruling that the Board should first consider the issues that fall within its jurisdiction. However, the factors the court cited as the basis for its ruling could apply equally to the discretionary doctrines of primary jurisdiction and equitable abstention.

23

The court identified the relevant issue as whether this is "a matter that should be dealt with by the Pharmacy Board." The court observed that "there is an administrative body that is set up to deal with this," and that "there's a very specific code section dealing with the regulation of pharmacists that indeed the doctor could have and should have taken advantage of."

As discussed above, the expertise of the Board is a key factor supporting the conclusion it has primary jurisdiction over the statutory obligations of pharmaceutical licensees. And the court's conclusion that Bradley "should have" taken advantage of that expertise suggests that the trial court recognized the benefits of administrative review. Certainly nothing in the court's comments suggests that the court would have exercised its discretion to proceed with the case in the first instance but for a mandatory exhaustion requirement. (See *Miller, supra,* 50 Cal.App.4th at p. 1677.)

The trial court's comments at a later hearing confirm that the court intended to exercise its discretion to stay the action pending review by the Board. On January 11, 2021, the trial court heard arguments on the demurrer that CVS filed after Bradley had amended his Complaint.[14] The court sustained the demurrer and ordered the action stayed pending Board consideration. In doing so, the court explained that "[w]hat's been presented to me thus far, as I review it, I still think that it appears that this a matter that should have been brought before

---

[14] At CVS's request, we took judicial notice of the transcript from that hearing.

24

the Board of Pharmacy. [¶] I think the Josh [*sic*][15] argument is good. I also think the doctrine of equitable abstention is a good argument that they make, that if we have two different forums addressing this, one the Board of Pharmacy, one the court, we have the potential of conflicting rulings. I think the court should allow the Board of Pharmacy to proceed first on this, and if there's anything that remains to be adjudicated, then we can adjudicate that in this court. [¶] That's why I think a stay is the appropriate course."

Although we conclude that primary jurisdiction rather than equitable abstention is the appropriate doctrine to apply here, the two doctrines are closely related and both require the exercise of discretion. The record shows that the trial court exercised its discretion in deciding that the "appropriate" course was to stay the action pending review by the Board. Under these circumstances, remand for further consideration of the primary jurisdiction doctrine is unnecessary.

---

15 The trial court presumably said "exhaustion."

## DISPOSITION

The trial court's ruling denying Bradley's motion for a preliminary injunction is affirmed.  This action shall remain stayed to permit Bradley to pursue a complaint with the Board.  Following a final Board decision on such a complaint, the action shall proceed on any remaining issues.  Should Bradley elect not to file such a complaint, the action shall be dismissed.

Respondents CVS Pharmacy, Inc., et al., are entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.

26